### LODER v. JAYNE et al.

(Circuit Court, E. D. Pennsylvania. January 22, 1906.)

#### No. 65.·

1. MONOPOLIES—CONSPIRACY—RESTRAINT OF TRADE—BURDEN OF PROOF.

The burden of proving a combination and conspiracy between manufacturers and wholesale and retail dealers of proprietary medicines and drugs in restraint of trade, in violation of Act Cong. July 2, 1890, c. 647, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200], injurious to plaintiff, and that defendants were engaged and took part in such conspiracy, was on the plaintiff.

2. SAME—COMBINATIONS IN RESTRAINT OF INTERSTATE COMMERCE—FIXING PRICES.

Where three voluntary associations, composed of the manufacturers, wholesalers, and retailers, respectively, of drugs, proprietary medicines, etc., were organized to arbitrarily fix a minimum retail price for such articles, which were of universal consumption and were of absolute and daily necessity, and then restricted the sale of such articles to such retailers only as conducted their retail business in accordance with the arbitrary standard of prices, such combination was in restraint of interstate commerce in the drug trade in so far as it excluded "aggressive cutters" of prices and those who dealt with them, and was in violation of Act Cong. July 2, 1890, c. 647, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200], prohibiting monopolies in restraint of interstate trade and commerce, etc.

3. TRIAL—ADMISSION OF EVIDENCE—ORDER OF PROOF.

In an action to recover damages for an alleged conspiracy in restraint of interstate commerce, it was within the discretion of the trial court

to admit evidence of acts and declarations of various of the defendant associations, their officers, committees, members, and agents, made in the absence of many of the other defendants, before a prima facie case of conspiracy had been established, and before privity of some of the defendants had been proven, on condition that such connecting evidence should be thereafter given.

4. MONOPOLIES—EVIDENCE—FINDINGS.

In an action for damages arising on an alleged conspiracy in restraint of interstate commerce, in violation of Act Cong. July 2, 1890, c. 647, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200], evidence *held* sufficient to establish the participation of certain of the defendants in such conspiracy.

5. SAME—COMBINATIONS IN RESTRAINT OF TRADE—DAMAGES—BURDEN OF PROOF.

In an action for damages for conspiracy in restraint of interstate commerce, in violation of Act Cong. July 2, 1890, c. 647, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200], the burden was on plaintiff to show some real actual damage to his business by reason of the alleged unlawful combination.

6. SAME—DAMAGES—EVIDENCE.

Where, in an action for damages to plaintiff's business because of an alleged conspiracy in restraint of interstate commerce, plaintiff claimed $5,000 compensation to himself for extra work claimed to have been required by reason of such unlawful combination, but failed to prove how much additional time he was required to spend in his business after the combination went into effect, he was not entitled to recover for such alleged extra services.

7. SAME—ADDITIONAL CAPITAL.

Where, in a suit for damages to plaintiff's business because of an alleged unlawful combination in restraint of interstate commerce, plaintiff claimed that because of such combination it was necessary to put $10,000 extra capital into his business from rents of his building, which were collected from time to time, but he testified on cross-examination that the payments of interest and taxes on the building were in excess of the amount paid into the business, he was not entitled to recover interest on such alleged additional capital.

8. SAME—INCREASED COST.

Where, by reason of an unlawful combination in restraint of interstate commerce in violation of the Sherman act, plaintiff was compelled to conduct his business at a greater cost, though it was greater in volume, and by reason of the injury he received a less percentage of return, he was entitled to recover such additional cost, though by reason of his increased efforts and the natural increase of his business he was enabled to withdraw from the business for his personal services an amount equal to, or larger than, he drew from the business before the conspiracy became operative.

At Law. On motion for a new trial.

W. Wilson Carlile and Henry J. Scott, for plaintiff.

Morgan & Lewis, O. E. Shannon, H. C. Haines, F. M. Cody, Hopper, Lessig & Smith, W. H. Hepburn, Charles Biddle, Frank Savidge, Henry D. Paxson, J. C. Jones, Henry La Barre Jayne, Irving P. Wanger, N. Dubois Miller, Joseph C. Fraley, and John G. Johnson, for defendants.

HOLLAND, District Judge. The plaintiff, C. G. A. Loder, brought suit against the above-named defendants, in this district, to recover damages to his retail drug business, which he claims to have suffered by reason of an agreement, contract, combination, and conspiracy into

which the defendants entered and carried into effect, in connection with other parties throughout the United States, in restraint of interstate trade and commerce, contrary to the provisions of Act Cong. July 2, 1890, c. 647, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200], entitled "An act to protect trade and commerce against unlawful restraints and monopolies." The provisions of this act of importance in this case are the following:

"Section 1. Every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade, or commerce among the several states or with foreign nations, is hereby declared to be illegal. Every person who shall make any such contract or engage in such combination or conspiracy shall be deemed guilty of a misdemeanor and on conviction thereof shall be punished by fine not exceeding five thousand dollars or by imprisonment not exceeding one year or by both said punishments, in the discretion of the court.

"Sec. 2. Every person who shall monopolize or attempt to monopolize or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several states or with foreign nations, shall be deemed guilty of a misdemeanor, and on conviction thereof, shall be punished by fine not exceeding five thousand dollars or by imprisonment not exceeding one year, or by both said punishments in the discretion of the court."

"Sec. 7. Any person who shall be injured in his business or property by any other person or corporation by reason of anything forbidden or declared to be unlawful by this act may sue therefor in any Circuit Court of the United States in the district in which the defendant resides, or is found, without respect to the amount in controversy and shall recover threefold the damages by him sustained, and the costs of suit, including a reasonable attorney's fee."

Under sections 1 and 2 of this act every contract, combination, or conspiracy in restraint of trade or commerce among the several states, or with foreign nations, and every combination or conspiracy to monopolize any part of the trade or commerce among the several states, or with foreign nations, is declared to be illegal, and every person who makes such a contract, or engages in such combination or conspiracy, or combines or conspires to thus monopolize, is declared to be engaged in an unlawful act; and the seventh section authorizes every person injured in his business or property to bring suit against such other person or corporation, who may be engaged in any such unlawful act, in the Circuit Court of the United States in the district in which the defendants reside or are found.

The plaintiff, claiming that all these defendants were engaged in such a combination and conspiracy to monopolize and to restrain trade, forbidden by these sections, brought suit under the act, and filed his statement of claim. The case was put at issue, and tried at the October term, 1905, and a verdict rendered in favor of the plaintiff against all the defendants, excepting Jayne & Son and Campion & Co., for the sum of $20,738. Motions and reasons for a new trial were filed on behalf of all the defendants, excepting the two above mentioned, and, in addition, there were filed motions for judgments non obstante veredicto upon the whole record in favor of H. K. Mulford Company, Hance Bros. & White, and Warren H. Poley. In addition to the request for binding instructions at the trial in favor of all the defendants, H. K. Mulford Company, Hance Bros. & White, and Warren H. Poley, by their attorneys, requested binding instructions in favor of

these particular defendants, which request was refused by the court, and under the provisions of the act of the General Assembly of the commonwealth of Pennsylvania, approved the 22d day of April, 1905 (P. L. 286), they are authorized to make this motion for judgment non obstante veredicto upon the whole record, in their favor.

There are in all 33 reasons for a new trial, which can be considered under three different heads: First, those which raise the questions as to whether or not the plaintiff charged and proved a violation of the Sherman act, and as to the correctness of the charge and rulings of the court in this connection; second, the admissibility of certain evidence; third, the sufficiency of the proof of the different items of damage claimed.

In his statement of claim Loder alleges, and offered evidence to prove, that for more than 20 years he has been engaged in the business of dealing in drugs at wholesale and retail in the city of Philadelphia, buying and selling his merchandise in various cities of the union without any hindrance to him by any one until November 1, 1900, when the injury to his business complained of began, and this he says was brought about by the defendants and others acting together in a combination and conspiracy, which he lays in his statement of claim in language following:

"The Proprietary Association of America, the National Wholesale Druggists' Association and the National Association of Retail Druggists, their officers, delegates and members unlawfully entered into an agreement, combination and conspiracy in restraint of trade or commerce among the several states and with foreign countries in this, to wit: that they unlawfully agreed, contracted, combined and conspired to enhance and arbitrarily to fix, regulate and determine the wholesale and retail prices at which various commodities of the drug trade consisting of patent medicines, drugs and proprietary articles manufactured in the several states should be sold to the retail druggists and by the said retail druggists to the consumers, residents of the several states of the United States."

The Proprietary Association of America is an unincorporated association composed of over 90 per cent. of all the manufacturers and proprietors of patent medicines within the United States; the National Wholesale Druggists' Association is an unincorporated association composed approximately of 95 per cent, of all the wholesale druggists of America who are engaged in the business of selling at wholesale drugs and proprietary articles to retailers for the manufacturers and proprietors of these drugs throughout the United States, and all the defendant wholesalers are members of this association; and the National Association of Retail Druggists is also an unincorporated association, with headquarters at Chicago, and has a membership composed of the local association of druggists, the members of these local associations comprising about 90 per cent. of the retail druggists in the cities, towns, and counties, or districts throughout the United States in which local organizations are formed, and these local associations are represented in the National Association by delegates periodically chosen for that purpose. There is also an incorporated association, one of the defendants, the Philadelphia Association of Retain Druggists, composed of nearly all the retail druggists in the city of Philadelphia, and with which association all the defendants named

in this suit who are engaged in the retail drug trade are connected either as members or officers. This local association is a member of the National Association of Retail Druggists, and these defendants, who are members, have been acting in accordance with the rules and regulations of the National Association in the conduct of their business as retailers.

The burden of proving the existence of this agreement, contract, combination, and conspiracy, and that the defendants were engaged and took part in it, was upon the plaintiff, and for that purpose evidence, which was uncontradicted, was offered to prove that the National Association of Retail Druggists had its central office in Chicago, and received financial support from all the other associations and many of the members belonging to them; that from this central point organizers were sent out for the purpose of bringing the local retail dealers into associations, and, as a result, Philadelphia retailers were organized into an incorporated association known as the Philadelphia Association of Retail Druggists. In accordance with the plans suggested by the organizers sent from Chicago, the Philadelphia retail druggists working with the organizers secured a consensus of opinion of the retailers here from which they fixed the minimum rate at which drugs should be sold at retail by the retail druggists in Philadelphia and vicinity. All the retail dealers were then notified of this minimum rate, and in case the retailer cut below the price so fixed his name, with this information, was sent to the National Association of Retail Druggists at Chicago, and the secretary, Mr. Wooten, then placed the name of this retail druggist upon what was known as an "aggressive cutter's" list, and this aggressive cutter's list, with his name thereon, was sent to all proprietors, members of the Proprietary Association of America, and all the wholesalers, members of the National Wholesale Druggists' Association, with the request that they cease selling any drugs whatever to such aggressive cutter; and it was further established, in case any proprietor or wholesaler, after receiving this notice from the secretary of the National Association of Retail Druggists, failed to obey and cease selling to such aggressive cutter, this information of his failure to obey also found its way to the secretary of the National Association of Retail Druggists, and such disobedient proprietor or wholesaler was disciplined by being put upon what was designated as a "pink slip," and his name was sent to all retailers throughout the United States with the information that he had been selling to aggressive cutters, and the request made to the retailers throughout the country to cease making any further purchases from such delinquent wholesaler or proprietor.

It is very plain that this arbitrary fixing of a minimum retail price for drugs which are of universal consumption and of absolute and daily necessity and then restricting their sale to such retailers only who conduct their retail business in accordance with this arbitrary standard of prices is a clear restraint of interstate commerce in the drug trade to the extent of excluding the aggressive cutters and those who deal with them, and is in violation of the act. The plaintiff was reported to Secretary Wooten, and on November 1, 1900, his name was placed upon an aggressive cutter's list, from which date down

until the 28th day of July, when suit was brought in this case, he was unable to buy drugs direct from the proprietors or wholesalers in the United States, but was compelled to purchase them in the name of other persons and in various indirect ways, and even then was unable · to keep his store stocked as extensively as a retailer usually requires. Thus embarrassed, he was compelled to secure these drugs at a much greater cost than he would have paid had he been able to purchase in the regular way.

The evidence shows that all the defendants against whom the verdict was rendered were connected with one or the other of these associations; were cognizant of the method adopted to coerce the retailers to adopt the minimum rate, and participated in the scheme of punishment visited upon all who cut below the price fixed. Of course, there was no documentary evidence which the plaintiff could produce to show this alleged conspiracy, except copies of the kind of "aggressive cutter's" lists and "pink slips" sent out by Mr. Wooten, or, that one of the objects of these associations, and the members thereunto belonging acting together, was for this alleged purpose, but the court permitted him to show the close association of all these organizations engaged in the drug business, their acts and declarations appearing in their printed records of their joint and separate meetings, the publications and declarations made in their official organ in support of their rules and regulations jointly and separately enacted for the purpose of effecting the object of this association. It nowhere expressly appeared that one of the objects was to combine for the purpose alleged in the plaintiff's statement and to carry it out by the drastic, disciplinary methods proven at the trial. On the other hand, the evidence showed that their reports, speeches, declarations, and resolutions were usually couched in language which, upon its face, was not inconsistent with a lawful purpose, but taken in connection with what afterward occurred, and the implicit obedience with which the members, and particularly the defendants in this case, obeyed the command of the secretary of the National Association of Retail Druggists, it was for the jury to say whether or not the evidence as a whole did not justify the finding that an agreement, contract, combination, and conspiracy such as charged existed, and whether the defendants were engaged in it. The jury were instructed that if the combination and conspiracy set forth in the statement existed, it was in violation of the Sherman act, and it was for them to say whether or not the plaintiff had proven his case. The jury found in his favor.

These instructions, upon a review, we are convinced were properly given, and that the findings of the jury were based upon competent evidence. Many acts and declarations of the various associations, their officers, committees, members, and agents made in the absence of many of the other defendants in the case for the purpose of proving the conspiracy were admitted before a prima facie case of conspiracy had been established and before the privity of some of the defendants had been proven. It is true that the rule in the admission of evidence in conspiracy cases is to require first the proof of a prima facie case of conspiracy before the acts and declarations of co-conspirators made in the absence of defendants are admitted against them, although the

court may, in its discretion, permit evidence of the declarations to be introduced out of its order, upon condition that it be afterwards followed by evidence of the conspiracy, and in some peculiar instances, in which it would be difficult to establish defendant's privity without first proving the existence of a conspiracy, a deviation has been made from the general rule, and evidence of acts and conduct of others has been admitted to prove the existence of a conspiracy previous to the proof of the defendant's privity. Substantially the same rule applies in criminal as in civil cases as to the admissibility of the acts or declarations of one conspirator as original evidence against each member of the conspiracy. Elliott on Evidence, vol. 4, § 2939; Id. vol. 1, § 249; Rice on Evidence, vol. 3, p. 904, § 578d. All the evidence sought to be stricken out by the motion of defendants, which raised the question of the competency of this evidence, was of this character and clearly admissible. On the whole evidence, the combination and the privity of defendants were established by proof of facts personal to each connecting him therewith. The question of damage will be considered after disposing of the motions for judgments non obstante veredicto.

It is contended that upon the whole record notwithstanding the verdict judgment should now be entered by the court in favor of Hance Bros. & White, H. K. Mulford Company, and Warren H. Poley. As we have already concluded that the combination and conspiracy alleged in the statement of claim, if proven, was in violation of the act of Congress, and the verdict of the jury in favor of the plaintiff having established its existence, the only question to be determined as to these three defendants is whether or not there is any evidence to show that they or either of them were engaged in it. Hance Bros. & White and H. K. Mulford Company were members of the National Wholesale Druggists' Association, and Warren H. Poley was a member of the Philadelphia Association of Retail Druggists. It is not attempted to hold any of these defendants through the associations with which they are affiliated. The suit as to them is directly against the firm of Hance Bros. & White, the corporation of H. K. Mulford Company, and Warren H. Poley individually. The combination and conspiracy in which it is alleged they were engaged and which caused the injury to the plaintiff was for the purpose of arbitrarily fixing, regulating, and determining the wholesale and retail prices at which drugs should be sold to retail druggists, and by them to the consumers throughout the United States, and to carry into effect this combination or conspiracy, it is claimed that these defendants, with others in the suit, took part in the proceedings of the various organizations with which they were affiliated in bringing about and formulating rules and regulations by which delinquents could be placed upon the aggressive cutter's list, and pressure brought to bear upon them for the purpose of compelling them to conform to the demands of those engaged in the combination and conspiracy. Each of these defendants who took part in the meetings which brought about this central organization at Chicago, with power to carry into effect these disciplinary measures, acted upon the commands of the secretary of the National

Association of Retail Druggists with regard to the punishment administered to those who were blacklisted.

The evidence shows that these three defendants were fully aware of the methods pursued by the associations to which they belonged by which their members strengthened and perfected the system of coercion emanating from Chicago, and that they, to a more or less extent, participated and acquiesced in the preliminary arrangements leading up to the consummation of the plan. The Philadelphia Association of Retail Druggists, of which Mr. Poley is a member, is a corporation, and made a defendant in this case, yet whatever part he took as an individual in the preliminary and final steps taken to carry into effect the combination and conspiracy as charged, he must answer for in his individual capacity. What part, if any, did these defendants take? The Philadelphia Association of Retail Druggists, on January 31, 1901, sent out from the office of the executive committee, No. 4154 Lancaster avenue, Philadelphia, a letter marked personal and confidential, as follows:

"Being satisfied that the policy of your firm is one of fair and considerate dealing with the retail drug trade and.that you are willing to co-operate with the retail druggists along lines of mutual profit, we take the liberty of inviting your attention to the present unprofitable condition of the retail drug business in this city and of asking your co-operation with our efforts to better matters.

"The situation is this: The retail druggists of Phila. have agreed upon a schedule of prices for proprietary articles about 10 to 20% above those now generally received, the only one positively refusing to be controlled by this scale being Mr. C. G. Loder. In justice to those druggists located near Loder's store, we have deferred putting this schedule into effect until all could be protected by a common selling price, and Mr. Loder alone by his refusal, is obstructing this movement and is now preventing the druggists of this city from obtaining between prices for proprietary goods.

"We do not wish to coerce Mr. Loder or to force him into difficulties, but it does seem unfair that one man alone should deprive all the other druggists of Phila. of the fruit of many months' labor. We are willing to make reasonable terms with Loder, and have so offered, but his intention evidently is to block our plans that he may profit thereby and he refuses to agree with us.

"Under these circumstances, we think that we have the right, the right of self-protection, to ask you not to sell Mr. Loder any of your goods and proprietary articles until he agrees with us. We believe that when Mr. Loder finds that he is not greater than all the rest of Phila. druggists together nor entitled to more favor that he will listen to reason and be willing to co-operate with us along lines of mutual profits. We wish to bring him to this belief. and one of the means we are trying to use is to show him that dealers and manufacturers will not supply him with goods when by so doing they will be injuring the business of every other retail druggist in this city. We do not ask any one to refuse him goods for any other reason than this; that the interests and wellfare of all are greater than those of one alone!

"We therefore invite your careful consideration of this question, and we further ask in reply a statement from you of the position you may decide to take; for, by your action, you can either greatly help or materially retard the progress the retail druggists here have made towards the realization of better trade conditions.

"Yours very truly,
"The Executive Committee, Phila. Association of Retail Drugg."

To which Hance Bros. & White replied:

"The policy of our house is not to sell to department stores. If the party you mention sells our goods, he does not get them from us as we don't sell him."

Subsequently, in June, 1903, a resolution C, which had been adopted by the wholesalers, as follows:

"Resolved, That in accordance with the recommendation of President Sealey, the Secretary is instructed to request all manufacturers of chemicals, pharmaceuticals, plaster, dressings and like products handled by the drug trade, to desist from selling aggressive cutters or supplies of cutters when solicited to do so by the respective local associations, and that the retail druggists shall be made acquainted with the response in such manner as the executive committee may deem best."

—was sent out to the drug trade in connection with the following query:

"Will you, when specially requested by the officers of the local association of retail druggists throughout the country that are affiliated with the N. A. R. D., refuse all sales to these price demoralizers whom the various manufacturers of proprietaries have designated as aggressive cutters?"

To which Hance Bros. & White, on June 24, 1903, responded as follows: "Our answer to the National Secretary's question is 'Yes.'" The receipt of this circular letter, the response to the inquiry accompanying resolution C, together with other statements made by Anthony M. Hance as to the connection of his firm with the alleged combination and conspiracy, show that they are equally responsible with the other defendants in the case.

From the testimony of H. K. Mulford, the vice president of the H. K. Mulford Company, we find that his company is an associate member of the National Wholesale Druggists' Association. It was shown that this, with the other associations, at various times acted together through committees appointed for that purpose, and worked in entire harmony with each other, and that he received information from the very headquarters of the combination, to wit, the secretary of the National Association of Retail Druggists at Chicago, and his company acted in strict compliance with the demands of the alleged wrongdoers for the reason that Loder was demoralizing business conditions and appeared upon the aggressive cutter's list. Mr. Mulford admitted that he received the information as to Loder cutting prices through the secretary of the National Association of Retail Druggists, and declared that his company would refuse to sell any wholesaler who was supplying Loder with goods, if his name appeared upon the aggressive cutter's list. The company's connection with the wholesalers' association, and its action in connection with the disciplinary rules administered to delinquents, was evidence to be submitted to the jury as to whether or not it was, through its officers, one of the parties engaged in the alleged combination and conspiracy. It is not denied but that the Mulford Company, or any other defendant, would be privileged to buy from or sell to, or refuse to buy from or sell to, any other person for any reason that might suggest itself without being responsible in damages under the Sherman act, but if the defendant acted upon a policy in accord with those shown to be in a combination and conspiracy not to sell to aggressive cutters, and received its information from them, and acted upon it, and, at the same time, was an associate member of one of the associations, there is sufficient evidence to submit to the jury to say whether it was part of the combination, or acted independently, as claimed. The jury found against the company, and in this I think they were right.

Mr. Poley was an active member of the Philadelphia Association of Retail Druggists, and took part in its proceedings at a meeting where a resolution was offered "advising the National Association of Retail Druggists to exhaust every means before taking final action disciplining the firm of Smith, Kline & French Company." It is very evident he knew the nature of these disciplinary measures, as it appeared in the evidence that the Smith, Kline & French Company were subsequently blacklisted and punished for disobedience, and a "pink slip" sent out against it. Mr. Poley, prior to that time and some time before the latter part of the year 1903, offered a resolution, which was passed at a meeting of the local association, as follows:

"That our delegates to the Convention of the N. A. R. D. be instructed to use utmost endeavors to have resolutions passed at the coming convention that the druggists of America refuse to handle any new proprietaries unless protected in price."

The gist of this resolution was enacted at the Boston convention of wholesalers, and the punishment inflicted upon any one who demoralized these prices is through the very association to which his resolution appealed. Surely he cannot now be heard to say that he took no part in bringing about the creation of this system of coercion to sustain prices. The motions for judgments non obstante veredicto in favor of these three defendants, for the reasons stated, are overruled.

The plaintiff's claim for damages submitted to the jury was made up of the following items:

| | |
|---|---|
| Compensation to the plaintiff for extra time and labor covering a period of four years.........................................$20,000 00 | |
| Eight per cent. increased cost on $96,000 of proprietaries purchased during period from November 1, 1900, to July 25, 1904........ | 7,680 00 |
| Extra clerk hire $1,000 per year................................. | 1,000 00 |
| Interest on $10,000, extra capital, for 4½ years................. | 2,700 00 |
| Loss of profits on sales lost from June 3, 1904, to July 25, 1904.... | 36 72 |
| Making a total of......................................$34,416 72 | |

The jury rendered a verdict for $20,738, and the defendants contend that even if it be conceded that a combination and conspiracy prohibited by the act had been established, there was not sufficient evidence from which the jury could find damages to the extent of the verdict rendered, and it is specifically urged that there was no competent evidence submitted upon which the jury could find in favor of the plaintiff for any part of the claim for extra labor of $20,000, increased cost on proprietaries $7,680, or interest on extra capital of $2,700, and, further, that, even if the plaintiff had proven the necessity for an extra clerk, his salary was only $18 a week, and the claim could only be made for 3¾ years. The burden of proof was upon the plaintiff to show some real and actual damage to his business by reason of this unlawful combination, and it is equally well settled that unless they prove this damage by a preponderance of competent evidence, the verdict must be for the defendant. The items of damage claimed must be established by proof of facts from which they may be rationally inferred with reasonable certainty by the jury. Coal & Coke Co. v. Hartman, 111 Fed. 96, 49 C. C. A. 244; Lowry v. Tile, etc., Ass'n (C. C.) 106 Fed. 46.

The plaintiff claimed the sum of $5,000 for extra compensation for himself for extra work which he claimed he was required to bestow upon his business by reason of this unlawful combination. It was objected that this was not a proper item of claim, but the court permitted the plaintiff to offer such proofs of additional labor as he desired to submit, and the plaintiff, instead of showing facts and circumstances from which the jury could estimate the value of the extra services; that is to say, instead of proving the amount of additional time given to his business by showing how much time he had devoted thereto prior to November 1, 1900, and then how much additional time was required of him each day, or each week, or each month, or each year, after the 1st day of November, 1900, and during the time he was on the aggressive cutter's list—he simply stated that prior to the injury complained of the business was conducted by him, giving it a supervision only, and he was able to go abroad upon two occasions, and to devote some time to recreation and pleasure, whereas, after the combination went into operation, he was compelled to devote his entire time to his business, "except in the afternoon he could take a little recreation." There was ample opportunity offered the witness to show what additional labor he was required to bestow upon the conduct of his business, but he offered no evidence whatever other than the mere, vague, indefinite assertion that he was compelled to devote his entire time to his business after he was blacklisted "except in the afternoons he could take a little recreation," and that this indefinite bestowal of additional labor was worth $5,000. There was no evidence in support of this claim to submit to a jury from which they could reasonably estimate what compensation he should have for any additional labor. From this they could only guess and speculate upon an amount as to this item of claim, and this a jury cannot be permitted to do.

It was claimed that it was necessary to put extra capital, amounting to $10,000, into the business because of the existence of the combination, necessitating his paying cash for many articles which theretofore he purchased on credit, and that this extra capital was placed in the business from rents collected, from time to time, from tenants in his building at Sixteenth and Chestnut streets; but upon cross-examination it was shown that as a matter of fact, instead of proving that $10,000 additional capital was added and used for 4½ years as claimed, the payments of interest and taxes on the building were in excess of the amounts paid in, and the plaintiff erroneously assumed that he was entitled to interest on the rents paid in. A review of the evidence shows that in these two items the plaintiff failed to prove his claim.

In support of the other three items of claim, the plaintiff submitted the best evidence he could produce under the circumstances. While the law puts the burden of proof upon the plaintiff and requires the proof of such facts as will enable the jury to arrive at the amount of damage with reasonable certainty, it will not permit the defendants who are, through their wrongful acts, responsible for the plaintiff's injury, to carry this requirement beyond the measure of proof thus stated. He is required to prove his claim with reasonable certainty and no more. We think the plaintiff has complied with this require-

ment as to these claims. The verdict as a whole, however, being far in excess of the total amount of these three claims, which were sustained by competent evidence, under the law it is the duty of the court to either require the plaintiff to remit this excess or grant a new trial. The claim for extra clerk hire at $16 per week to March 1, 1904, and at $18 per week thereafter during the existence of the combination would make a total of $3,164, and the damages claimed for extra cost of proprietary articles, amounting to $7,680, together with the $36.52 for loss of profits on sales lost, make a total of $10,880.52 which was proven by competent evidence with reasonable certainty.

There is one other question raised which cannot properly be classed in any of the foregoing propositions, and which, it has been contended, has some bearing upon the question of whether or not plaintiff suffered any damage. The books of the plaintiff show that beginning with the year 1899 down to the time of bringing suit he drew out of the business the following amounts:

| | |
|---|---|
| 1899 | $5,663 00 |
| 1900 | 6,069 00 |
| 1901 | 7,376 00 |
| 1902 | 7,643 00 |
| 1903 | 5,464 00 |
| Seven months in 1904 | 3,071 00 |

It was strenuously argued to the jury by counsel for the defendants that, as Loder had been able to take as much out of the business for personal service during the time the alleged combination and conspiracy existed as before, he had suffered no injury; and, the court having failed to call the jury's attention to this fact in the general charge, defendants' counsel took an exception to that failure, and suggested to the court before the jury retired the propriety of calling their attention to this evidence for that purpose. It was shown by the books of the plaintiff that, beginning with 1897, to November 1, 1900, he had purchased merchandise to the amount of $223,645, which he sold at retail for $296,739, at a gross profit of 33 per cent. on the purchasing price, making $73,094, and during the time he was on the aggressive cutter's list he purchased merchandise at a cost of $265,821 which he sold at retail for $326,559, being a gross profit of 23 per cent. on the purchasing price, making a total of $60,738. It might be here remarked that in view of the fact that the evidence showed that retail prices were generally higher during the time Loder was on the blacklist, this loss of 10 per cent. on gross profits during that time, as shown by the books, is strongly corroborative of his claim that he was compelled to purchase his drugs at an increased cost of 8 per cent.

But as to the amount the plaintiff drew out and its bearing upon the question of damage it will be remembered that he did not claim in this case any damage for a falling off of either gross or net income, because through the extra exertion and natural increase of his business, although at extra cost by reason of the combination, the gross and net income was kept up nearly to that which he made prior to the combination on much smaller purchases and sales. Progressive business men start in a small way and through their energy and busi-

ness ability develop a small concern, in a short time, into one much larger and bringing far greater returns. If, by reason of a combination in violation of the Sherman act, he be made to conduct what business he does at a greater cost, though it be greater in volume, but by reason of the injury done him at a less percentage of return, and he can show this, he is entitled to collect it from those who have injured him. A calculation made from the books of the plaintiff in this case shows that although Loder through his industry and perseverence, notwithstanding the injury inflicted, did a greater volume of business, but was compelled to do it at a 10 per cent. less profit, and he offered evidence to prove this loss was the result of this combination and conspiracy. So that, it would seem to me, the fact of his drawing out an amount for personal compensation, which did not diminish after the combination went into effect, was under the circumstances no evidence whatever of a failure to establish an injury to his business in the elements claimed. The natural increase of his business, which was done at a greater cost, made his gross and net income sufficient to enable him to take these amounts out for his personal use, but these amounts did not in any way show that either the net or gross income during the time he was on the blacklist was greater in amount than it was before, nor could it in any way throw light upon the question of the extra cost and losses which he sustained by reason of the combination, and for that reason the court did not deem it its duty to call the jury's attention to the evidence for the purpose indicated by the defendants. The court being satisfied that the verdict is excessive in amount and being able clearly to establish by computation the amount of this excess, it is the duty of the court to grant a new trial to the defendants, unless the plaintiff, within the time hereinafter specified, files a remittitur for the excess. Pepper & Lewis' Digest of Decisions, 23,029; Pleasants v. Fant, 89 U. S. 116, 22 L. Ed. 780; Southern Pacific Co. v. Hamilton, 54 Fed. 468, 4 C. C. A. 441.

A decree will, therefore, be entered that the plaintiff file a remittitur in the amount of $9,857.48 on or before February 1, 1906, reducing the verdict to the sum of $10,880.52 or a new trial will be granted. In case a remittitur be filed reducing the verdict to $10,880.52, the clerk is directed to multiply the said amount, to wit, $10,880.52, by three, and enter judgment in favor of C. G. A. Loder and against Frederick Aschenbach and Adolph William Miller, trading as Aschenbach & Miller; C. F. Shoemaker and Miers Busch, trading as Shoemaker & Busch; Richard M. Shoemaker, Thomas E. Shoemaker and Benjamin H. Shoemaker, trading as Robert Shoemaker & Co.; Smith, Kline & French Company; John Wyeth & Bro. (incorporated); Valentine H. Smith & Co.; Henry K. Wampole, Albert J. Koch, S. Ross Campbell, trading as Henry K. Wampole & Co.; Edward H. Hance, Joseph C. Hance, Anthony M. Hance, and Edward H. Hance, Jr., trading as Hance Bros. & White; H. K. Mulford Company; William R. Warner, trading as W. R. Warner &. Co.; Philadelphia Association of Retail Druggists; and Thomas H. Potts, William L. Cliffe, William E. Lee, David J. Reese, George W. Fehr, Carl W. Shull,

Nathan Cozens, Augustus T. Pollard, Henry C. Blair, William H. Gano, Alexander H. Frankeberger, Charles Leedom, Richard H. Lackey, Henry A. Nolte, Walter A. Rumsey, James C. Perry, E. C. Bottume, Warren H. Poley, Henry A. Borell and Charles A. Eckles, defendants, for the sum of $32,641.56 and an attorney's fee of $2,500 to be paid to the plaintiff's attorney.