JAYNE et al. v. LODER.

(Circuit Court of Appeals, Third Circuit. December 3, 1906.)

No. 34, March Term, 1906.

1. NEW TRIAL—GROUNDS—SUBMISSION OF INCOMPETENT EVIDENCE OF DAMAGES —REMISSION OF EXCESS OF RECOVERY.

Where a plaintiff's claim for damages for a tort was submitted to the jury on incompetent evidence as to certain of the items claimed, and a verdict was returned for plaintiff for less than the total amount claimed, the error cannot be rectified by requiring a remittitur of the amount of the items so erroneously submitted, since the court cannot know whether, or to what extent, such items entered into the verdict, and the only remedy is by the granting of a new trial.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 37, New Trial, § 328.]

2. MONOPOLIES—SHERMAN ANTI-TRUST ACT—COMBINATION IN RESTRAINT OF INTERSTATE COMMERCE—MANUFACTURERS OF PROPRIETARY MEDICINES.

The manufacturer of a proprietary medicine may sell or withhold from selling as he pleases, fixing the prices, and naming the terms at and upon which alone he will do so, and refusing to sell to those who will not comply, and, so far as this is confined to his own goods, and pursued by independent and individual action, it is within his rights: but when two or more combine and agree that neither will sell to any one who cuts the prices of any of the others, this concerted policy, by which it is sought, not only to maintain by each the price of his own medicine, which alone he is interested in or has the right to control, but also the prices on those of all who are thus banded together, is a direct interference with and restraint upon the freedom of trade, and when it affects interstate commerce is clearly a combination and conspiracy in restraint of such trade, in violation of the anti-trust law of July 2, 1890 (26 Stat. 209, c. 647 [U. S. Comp. St. 1901, p. 3200]).

[Ed. Note.—For cases in point, see Cent. Dig. vol. 35, Monopolies, § 13.]

3. SAME—COMBINATION OF ASSOCIATIONS IN DRUG TRADE.

Three national associations of persons interested in the drug trade— the Proprietors' Association of America, composed of manufacturers of proprietary medicines, the National Wholesale Druggists' Association, and the National Association of Retail Druggists—joined in the adoption of a so-called "tripartite agreement," the purpose of which was to maintain the retail prices of patent or proprietary medicines, and which provided that wholesalers should refrain from selling such medicines at any price to "aggressive cutters" of prices or brokers; an aggressive cutter being defined as a dealer who was so designated by 75 per cent. of the local trade at any given place. Pursuant to such concerted plan, to which all were bound and to carry it into effect, proprietors thereafter sold only at fixed and uniform prices to those wholesalers who agreed to maintain prices, and not to sell to aggressive cutters or brokers, in accordance with a list furnished by a committee of the wholesalers' association, while the list of aggressive cutters was furnished by the secretary of the retailers' association. If a wholesaler violated such agreement, and sold to an aggressive cutter, he was at once reported, and his name added to that list, and notice of the fact sent to all retailers who were members, with a suggestion that they act for the protection of their interest. If he was reinstated, a second notice of that fact was sent. Held, that such concerted plan and action constituted a combination and conspiracy in restraint of interstate commerce, in violation of the anti-trust law of July 2, 1890 (26 Stat. 209, c. 647 [U. S. Comp. St. 1901, p. 3200]).

[Ed. Note.—For cases in point, see Cent. Dig. vol. 35, Monopolies, § 13.]

**4. SAME—ACTION FOR DAMAGES—JOINDER OF MEMBERS OF SEPARATE COMBINATIONS.**

National associations of manufacturers of proprietary medicines, wholesale druggists and retail druggists, respectively, entered into a tripartite agreement for the purpose of maintaining prices of proprietary medicines, which constituted a combination and conspiracy in restraint of interstate commerce, in violation of the anti-trust law of July 2, 1890 (26 Stat. 209, c. 647 [U. S. Comp. St. 1901, p. 3200]), and adopted definite plans and methods for carrying it into effect by preventing retailers who cut prices from obtaining such medicines. Subsequently, to forward the same general purpose, the retailers' association proposed further plans and methods far more drastic, under which such price cutters were prevented from obtaining any druggists' supplies. These plans were not adopted by the other associations, but were assented to by some of their members individually upon direct appeal but not by others. *Held*, that the two combinations were separate and distinct, and that a party to the first, who did not become a party to the second, was not bound thereby, and could not be joined as a defendant in an action for damages under the statute with other defendants, who were parties only to the second agreement, nor was the latter admissible in evidence against him.

In Error to the Circuit Court of the United States for the Eastern District of Pennsylvania.

For opinion below, see 142 Fed. 1010.

W. Horace Hepburn, Irving P. Wanger, and John G. Johnson, for plaintiffs in error.

Henry J. Scott, for defendant in error.

Before DALLAS and GRAY, Circuit Judges, and ARCHBALD, District Judge.

ARCHBALD, District Judge. This case was an involved and tedious one, and the reluctance of counsel to retry it is not to be wondered at. The suggestion at bar, however, that there should be no reversal unless it could be without a venire, was not put in shape to be acted upon; and as material error has been assigned which cannot be passed by, nothwithstanding the painstaking care with which the case was considered and the correctness with which, in the main, it was disposed of, it must nevertheless go back and be tried over.

The error which lies on the surface is the attempt of the court, by a reduction of the verdict, to eliminate items of damage with regard to which there was admittedly no sufficient evidence. The damages claimed by the plaintiff were $34,416.72, made up as follows: Compensation for extra time and labor, covering a period of 4 years, $20,000; 8 per cent. increased cost on $96,000 worth of proprietary medicines purchased, $7,680; extra clerk hire for 4 years, $4,000; interest for 4 years on $10,000 increased capital required, $2,700; loss of profits on sales in June and July, 1904, $36.72. The jury gave a verdict somewhat less than this, for $20,738, which the court, on a rule for a new trial, still further reduced to $10,880.52, to which extent alone it was figured there was evidence to sustain it. Loder v. Jayne (C. C.) 142 Fed. 1010. It is not necessary to follow the steps by which this result was reached, or the reasoning by which it was sought to be justified. It is sufficient to note that the evidence with regard to the first and fourth items of claim was held to be insufficient, and that the item of clerk hire

was found to be substantiated to the amount of but $3,164. Putting this and the remaining two items together, the verdict was allowed to stand for the aggregate; all above that being required to be released.

The error which was so committed is manifest. The admission of incompetent evidence could not be cured in any such way. The verdict rendered is based on the whole of it, good and bad, and there is no means of knowing by what items the jury were influenced, or how far the items which are now allowed were accepted by them, or entered into their calculations. As it stands, the verdict is judge made; the only virtue in it being that it is within the amount assessed by the jury. But that coincidence does no help it, the amount so found being the result of evidence improperly submitted for their consideration, the only remedy for which was to grant a new trial. Jacoby v. Johnson, 120 Fed. 487, 56 C. C. A. 637. See, also, Watt v. Watt, L. R. App. Cases (1905) 115.

More important, however, is the question which is raised, whether the defendants are in any respect liable. The action is for damages, under the act of Congress of July 2, 1890 (26 Stat. 209, c. 647 [U. S. Comp. St. 1901, p. 3200]), commonly known as the "Sherman Anti-Trust Law," the defendants being charged with having entered into an unlawful combination injurious to the plaintiff, within its terms. The sections which obtain are given in the margin.[1] The drug trade is the one affected; the plaintiff being a retail dealer doing business in Philadelphia, and the defendants variously engaged as wholesale or retail druggists or manufacturers of patent medicines and pharmaceutical supplies. The plaintiff is the subject of trade animosity because he does not maintain the price of medicines, as the defendants think he ought to, and as they have agreed among themselves that they shall be. He is what is known as an "aggressive cutter," against whom and others similarly actuated the acts complained of are directed.

That which is charged to be a combination in violation of the act consists primarily in what is known as the "Tripartite Plan," so called

"1. Section 1. Every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade, or commerce among the several states or with foreign nations, is hereby declared to be illegal. Every person who shall make any such contract or engage in such combination or conspiracy shall be deemed guilty of a misdemeanor and on conviction thereof shall be punished by fine not exceeding five thousand dollars or by imprisonment not exceeding one year or by both said punishments, in the discretion of the court.

"Sec. 2. Every person who shall monopolize or attempt to monopolize or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several states or with foreign nations, shall be deemed guilty of a misdemeanor, and on conviction thereof, shall be punished by fine not exceeding five thousand dollars. or by imprisonment not exceeding one year, or by both said punishments in the discretion of the court."

"Sec. 7. Any person who shall be injured in his business or property by any other person or corporation by reason of anything forbidden or declared to be unlawful by this act may sue therefor in any Circuit Court of the United States in the district in which the defendant resides, or is found, without respect to the amount in controversy and shall recover threefold the damages by him sustained, and the costs of suit, including a .reasonable attorney's fee."

because of its being entered into by the three affiliated associations in the drug trade—the Proprietary Association of America, the National Wholesale Druggists' Association, and the National Association of Retail Druggists—of one or the other of which the defendants are members. The purpose was to maintain the retail prices of patent or proprietary medicines by combined action, which was recognized as necessary to accomplish it. These medicines, being compounded according to secret formulas by those who originate them, are made popular by extensive advertising, and are supposed to be retailed to the consumer at uniform prices, fixed by the proprietors and named on the package. In some parts of the country this is carried out, but in others, and particularly in the large cities, where competition is keen, there has for a long time been a cutting of prices by the retailer, which has reacted on the jobber or wholesaler, as well as the proprietary, demoralizing all branches of the trade. This condition was the subject of extended discussion and animadversion for a number of years at various meetings of the several associations involved; different means for remedying it being proposed. The plan finally formulated was adopted upon an overture from the retailers at the annual meeting of the wholesalers at Chicago in September, 1900, in which the proprietors as associate members participated. It seems to have had its inception in a resolution passed at the preceding annual meeting of the wholesalers, in conformity to which the chairman of the proprietary committee and the chairman of the executive committee of the retailers sent out in March, 1900, a confidential circular, in the joint names of the two associations, to various patent medicine proprietors, urging them for the future to confine their best price sales to a uniform list of jobbers to be selected as wholesale agents. A number of prominent proprietors, who had already agreed to the proposed policy, was given, and in order to make it effective it was urged that each should send out to his wholesale distributing agents a printed price list, giving the regular rebates on goods when ordered in certain quantities, to be restricted, however, to those who did not divide quantities with others, or quote or sell these preparations, either directly or indirectly, or permit them to be disposed of in any way, at less than the prices stated. Favorable responses were received to these circulars, but at the suggestion of members of the retail trade, as well as in pursuance of views expressed by a large percentage of the jobbers, it was decided that the selection of the list of wholesale agents, to whom alone best price sales should be made, should be subject to certain conditions: (1) That jobbers through their salesmen should refrain from running down proprietary goods, and should sell whatever was called for by the customer without reference to any particular article happening to pay a higher profit; (2) that they ask no further discounts than already allowed; (3) that each jobber discontinue his so-called nonsecret department (referring to substitute preparations offered in place of proprietary medicines called for); and (4) that they refrain from selling proprietary preparations at any price, either directly or indirectly, to aggressive cutters or brokers; an aggressive cutter being defined as a dealer who was so designated by 75 per cent. of the local trade at any given place. The plan so recommended was adopted, not only, as already

stated, by the National Wholesalers' Association, but by the proprietors and retailers as well, and became the so-called "Tripartite Agreement" in suit. To be successful, it required the adherence and concerted action of the members of each association, and this was secured by direct appeal and individual assent. As the result of it, the proprietors sold only, thereafter, at uniform and fixed prices, to those wholesalers and jobbers who agreed to maintain prices and not sell to aggressive cutters and brokers; the recognized list of such jobbers being furnished to the proprietors by the chairman of the proprietary committee of the wholesalers, and the list of aggressive cutters, as reported by local associations of retailers, whose organizers investigated the matter, being made up and sent out to jobbers and proprietors by the secretary of the national retailers. If a wholesaler failed to regard this list, and sold to an aggressive cutter, he was promptly reported, and his name added to it. A pink slip was also sent out to all retail druggists who were members of the retailers' association, calling attention to the fact, and insinuating that such individual action be taken by each, protective of his own interest, as might seem advisable; a cessation of dealing being plainly intimated. And this was followed, in case of a correction of his ways by the wholesaler and his reinstatement, by a yellow slip, announcing that he was entitled to the same favorable consideration as before.

Notwithstanding, however, the seemingly drastic character of these provisions, the aggressive cutter having still a certain margin on which to trade if not thrive, at the annual convention of the National Retailers' Association at Cleveland in 1902, it was resolved:

"That * * * the secretary be instructed to request all manufacturers of chemicals, pharmaceuticals, plasters, dressing, and like products, handled by the drug trade, to desist from selling to aggressive cutters, or suppliers of cutters, when solicited to do so by the respective local associations; and that the retail druggists shall be made acquainted with the responses to such requests, in such manner as the executive committee may deem best."

This is the so-called "Resolution C," to be referred to more fully by that name as we proceed. Under the date of November 6 following, the national secretary accordingly addressed a circular letter to each of the manufacturers indicated, propounding the question whether, when specifically requested by local associations of retail druggists throughout the country affiliated with the National Retail Association, they would refuse all sales to those parties whom the various manufacturers of proprietaries had designated as aggressive cutters. To this appeal a large majority of the manufacturers made favorable reply; but, others having failed to do so, a second circular was issued, May 1, 1903, again calling attention to the matter, and notifying the parties addressed that there would be published in the official paper of the national association, called "Notes," a list of those who acquiesced and those who did not, requesting definite answer, as before. "It is believed," as it is significantly said in closing, "that a little reflection will convince you of the desirability of co-operating with the secretary of the N. A. R. D.[2] in the discharge of the important duty

2National Association of Retail Druggists.

that has been laid upon him." . The second circular brought in a large. number not secured by the first; the names of several of the defendants being found in the published list. The resolution under which this action was taken did not suggest the specific use which was expected to be made of the information conveyed by the publication, but several who had given in their adherence to the plan having fallen by the way, an honor roll was proposed later on, which should contain the names of those wholesale druggists and jobbers who refused, in the words of the committee, "to have any business dealings whatever with unfair price-demoralizers"; to be made up according as favorable response was made to the circular, and to be published the same as the other in the N. A. R. D. "Notes." In this connection, in the issue of January 22, 1904, the following assurance was given, anticipating, somewhat, the argument of counsel here:

"There is no federal or state law that can possibly be construed in such a way as to compel any jobber to sell goods he has bought and paid for to any person or persons he does not want to. This is a free country, * * * where freedom of trade within its borders is guarantied by constitutional provisions; and each wholesaler has an unalienable right to frame for himself a selling policy, in accord with his own ideas of what is best for his individual interest and the trade at large, and then to adopt and put this policy into effect."

There were other and further suggestions, from time to time, for concerted action against price cutters, in line with what has been so referred to—such as requiring salesmen to have cards of identification and regularity; providing for the advancing and making uniform the prices for prescriptions; having proprietors refuse to patronize newspapers where cut prices were advertised; and doing away with the necessity for a special request from local retail associations, in order to have wholesalers refuse to sell to aggressive cutters—all, except, perhaps, the last, emanating from and being advocated by the National Retailers' Association. But it is not necessary to follow the matter further. Sufficient has been given to show the character of the combination in restraint of trade which is charged, and the only question is as to the law which is to be applied. It is contended, on the one hand, that no unlawful combination is made out, the manufacturers of proprietary goods having the right to decide, each for himself, as was done, to whom and upon what terms and conditions he would sell, or whether he would sell at all; it making no difference, provided his policy in this regard was individual, whether it coincided with a similar policy, adopted by others of the same class or not, nor that the action so taken was to that extent concerted. The tripartite agreement, to which alone the proprietors subscribed, was not, according to this, unlawful; and as to anything after that to which they did not agree, or which they did not recognize or subscribe to, such as the so-called "Resolution C," with its honor roll and white list, got up by the secretary of the retailers on his own motion, under it, they are not answerable; and these were therefore improperly admitted in evidence against them. It is argued, on the other hand, that the combination and conspiracy for which action is brought is not to be limited to the tripartite agreement, or the sale of proprietary medicines to which it related, which was, however, unquestionably, an unlawful restraint of trade, within

the meaning of the act. But that it is to be taken as extending to everything which was done concertedly to carry out the pervading idea, to which the defendants individually and collectively subscribed, which was to cripple and drive out of business, by coercive measures, such cutters of prices as 75 per cent. of the local trade at any given place declared obnoxious. This, it is claimed, was the real conspiracy, of which the various steps taken were merely manifestations or overt acts, including "Resolution C," the "Roll 'of Honor List," etc.; all of which were therefore admissible against the defendants generally.

Both contentions are right to a certain extent; neither can be sustained in its entirety. Undoubtedly the originator and compounder of a proprietary medicine may shape his own policy, and sell or withhold from selling, as he pleases, according to supposed self-interest or whim; fixing the prices and naming the terms and conditions at and upon which alone he will do so, refusing to those who will not comply. And so far as this is confined to his own goods, and pursued by independent and individual action, it cannot be challenged. It is quite a different matter, however, when two or more combine and agree that neither will sell to any one who cuts the prices of any of the others. This concerted policy, by which it is sought not only to maintain by each the price of his own medicines, which alone he is interested in or has the right to control, but also the prices on those of all who are thus banded together, is manifestly a direct interference with and restraint upon the freedom of trade, which in commerce between the states it was the object of the act of Congress to preserve. As in every conspiracy, it is the joining together of a number that counts, and that the individual has to fear. It is true that a common plan or policy does not necessarily mean a combined one. The individual manufacturer or proprietor may be persuaded, for example, that the retailer or jobber who cuts the medicines of his neighbor to-day will likely cut his medicines to-morrow, and so decide not to sell him; and it will not make out a conspiracy that others are of the same mind. If that was all there was to the present case, it would be easily disposed of. But, unfortunately for the defendants, it is not. The policy adopted and pursued with respect to aggressive cutters and those who sold to them was not that of the proprietors only, acting independently, each with regard to his own, according to what seemed to him good. The arrangement was tripartite, in which all the affiliated associations of the drug trade were involved—proprietors, wholesale distributing agents or jobbers, and retailers, the latter, if anything dominating it—evolved after extended agitation, discussion, and conference, to which the members were individually and collectively bound, disciplinary and coercive measures being provided against any who proved recalcitrant. Let a patent medicine man or wholesaler disregard its terms, and he was quickly given to understand that, if he catered to the aggressive cutter, he could not expect the custom of the organized retailer, between whom it did not usually take him long to decide. He became, if he persisted, an unfair trader, to be treated accordingly, until he repented and was reinstated, after acknowledging the error of his ways, and agreeing to transgress no more. Against this discipline, and with this rod held over them, it is needless to say that

there were few who went astray, and still fewer who held out. There was, perhaps, a murmur here and there, a question raised as to whether they might not overstep the law, and a recognition that they were close to the line; but it was met by assurances such as that quoted above, or by suggestions of escape by individual action, which can hardly be expected to deceive. Nor did, indeed, the individual proprietor control his own prices, nor determine to whom his goods should go. This was done for him in the cities by the local associations of retail druggists, into whose hands he thus committed himself. The prices which should there prevail were of their naming, and aggressive cutters were those who did not maintain them, who were ferreted out, and reported by the retailers' agents. All this and more was part and parcel of the tripartite plan, to which the proprietary, as well as the wholesaler, bound himself when he entered into it.

If co-operation and concerted action such as this does not make out a combination and conspiracy in restraint of trade, it is difficult to see what would be effective to do so. The combination is clear, and has been demonstrated; so, also, is the restraint of trade. That indeed was the avowed purpose of it, which was not simply to put the aggressive cutter out of business, but to maintain prices to the consumer, by this means, as they would not be maintained if left to themselves. It seems incredible, except as the trade in patent medicines is known to be immense, but it is confidently asserted, by those having the right to speak, that the cost to the country of the tripartite agreement amounted to $90,000,000 in six years. The general public have thus, as usual, been made to foot the bill. That this constitutes in law, as in fact, an unlawful combination in restraint of trade, within the meaning of the act, there can be no doubt. Whatever may be decided elsewhere, the question is set at rest by Addyston Pipe Co. v. U. S., 175 U. S. 211, 20 Sup. Ct. 96, 44 L. Ed. 136, and Montague v. Lowry, 193 U. S. 38, 24 Sup. Ct. 307, 48 L. Ed. 608, which control. In the former there was a combination among certain manufacturers of cast-iron pipe, controlling two-thirds of the business in states of the South and West, by which they agreed to advance the prices to the consumer by abolishing competition between themselves, parceling out the territory, and fixing the prices at which sales should be made therein, going through the form of bidding against each other at times as a blind; the prices and the successful bidder in each case being pre-arranged. It was sought to defend this action, because the restraint was only partial, not extending to the whole United States; also, that the monopoly secured was not complete, being tempered by fear of competition from others not in the arrangement, and affecting only a modicum of the price; and again, that the prices fixed were reasonable, and within those which were being continually and unrestrainedly made, simply doing away with ruinous competition, to which the parties had a right. But these and other arguments were put aside, and the case declared to be one prohibited by the act. "It is the effect of the combination," says the court, "in limiting and restricting the right of each of the members to transact business in the ordinary way, as well as its effect upon the volume or extent of the dealings in the commodity, that is to be regarded." So in Montague v. Lowry, by an agreement between eastern manufactur-

ers of tiles and certain dealers in San Francisco and vicinity, an association was formed whose by-laws provided that no manufacturer should sell to any dealer not a member, nor should any dealer sell to the same except at certain list prices, which were 50 per cent. higher than those at which sales were made to other members; membership also being confined to those who carried an average stock of not less than $3,000 and who were acceptable. The plaintiffs were dealers in San Francisco, where they had built up a business, but were not members of the association, and were not eligible; and after its formation they found themselves unable to buy to advantage, being restricted to dealing with San Francisco parties, to whom they were compelled to pay the extra prices listed. On a suit against the association for damages under the act, a verdict for the plaintiff was sustained; the case being held to be clear. It is useless, in the face of these authorities, to urge upon us the decision in Park v. National Druggists' Association, 175 N. Y. 1, 67 N. E. 136, 62 L. R. A. 632, 96 Am. St. Rep. 578, where a different conclusion has apparently been reached. It is to be noted, however, with regard to that case, that the agreement there, as viewed by the majority of the court, was merely to sell to all wholesale distributing agents at uniform rebate prices, so that the small dealer, with limited capital, was put on a par with the large ones, whose capital was more ample, thus tending to fairness and equality, on which stress is laid. There was, however, the further provision (to say nothing of other restrictions) that until a wholesaler agreed to the plan he could not buy of any member of the association whatever, in view of which three of the judges dissented; the case being still further weakened as an authority by the failure of the majority to altogether agree in their reasoning. At the best, therefore, it is near the line, and in no event can it be taken, contrary to the cases cited, as giving the law here.

So far, then, as the present case was kept within the limits indicated by these observations, it was correctly disposed of, and is to be sustained; but outside of them not. Unfortunately it did not stop with the tripartite agreement and the action taken under it, but went on to Resolution C, with its honor roll and white list. It is urged that these were merely further steps in the general combination and conspiracy, to get rid of the aggressive cutter, on which all were determined, and for which, therefore, by whomsoever taken all were bound. But this fails to note several things. Speaking broadly, no doubt there was a general purpose, or conspiracy, if you will, to drive the plaintiff and others like him out of business, to which in entering into the tripartite agreement the parties committed themselves. At the same time, however, there was a selection of methods. Not only was a general policy declared for, but a definite line of action under it, adopted after extended consideration and conference, which could not be varied from at will. In accepting the tripartite plan, they did not necessarily agree to anything and everything which might be done in its name, and particularly not to Resolution C, which was recognized as a new and decidedly advanced step, expected to work a radical change. As already stated, this project emanated from the National Retail Druggists' Association, in annual convention assembled at Cleveland in 1902. But even among the retailers there were those who doubted the propriety,

as well as the legality, of it; as witness the remarks of the president, at the annual meeting just before that, at which, having been proposed, it was promptly voted down. Nor was it ever adopted by the proprietors or the wholesalers as a body; the only assent given to it being individual, and by no means by all. This was secured by direct appeal, and the circulars sent out were addressed to "Manufacturers and Dealers in Non-tripartite Goods"; showing that a different class was intended to be reached.

No connection, except the most general one, is thus established between the tripartite agreement and Resolution C, and they are not to be taken as one and the same plan. They may not differ much in principle, but they do decidedly in results; pressure being put upon the aggressive cutter as it had not been by any means before. By the one, he was merely deprived of patent medicines, as to which, right or wrong, the proprietor might feel that he had a certain freedom to sell or withhold, the same as is argued here; but by the other, he was cut off from the most ordinary druggists' supplies, even toothbrushes and sponges being denied. A retailer cannot do much, it is true, without proprietary goods on his shelves; but without drugs and pharmaceuticals he cannot put up a single prescription, and might as well go out of business; and that, indeed, was what Resolution C was designed to bring about. This was an excursion into a new field, and to whatever else short of that the proprietor or wholesaler was committed, he might not care to go that far. He was at least entitled to have it distinctly presented for his acceptance before being bound, and his assent is not to be implied simply because he had agreed to what had gone before. He did not put himself indiscriminately and to all lengths into the hands of his associates. The trade recognized that this was the case, and that there were classes among the wholesalers, as shown by the publication called "Notes," of May 21, 1904, where those operating under the tripartite agreement are set apart from those operating under Resolution C. This may not be conclusive, but it is significant, and confirms, as it corresponds, with our own views.

As distinguished by parties, also, the combination was new. No doubt there were many who had agreed to the tripartite plan, who also agreed to Resolution C. But there were some who did not, who are defendants here, as well as some who agreed to the resolution alone. They divide on these lines, and cannot be brought together as one, so far as anything has been shown; and neither, as the result, can a joint action be maintained. As the case stands, however, all are made liable without distinction, for all that has been done, both under the tripartite agreement, as well as Resolution C; both being put in evidence against them all. It may be that a person who joins a conspiracy at an advanced stage of it makes himself party to what has been done in pursuance of it before. 3 Greenl. Ev. § 93, Lewis Ed. 8 Cyc. 658. But this must be with knowledge, and in promotion of the common cause. And even though, upon this basis, those wholesalers, who, with knowledge of the existing purpose to drive aggressive cutters out of business, lent themselves to this design, by denying him their goods as called for by Resolution C, could be held for the damages resulting from the whole scheme, still, as already pointed out, there is too wide

a divergence between the original tripartite plan and this later extreme development of it to make those who merely agreed to the one committed irretrievably and without question to both.

Upon the whole case, therefore, we reach the conclusion that Resolution C was inadmissible to charge those who had not assented to it, and should not have been received in evidence, nor anything done under it. The wrong which was committed by its adoption and enforcement was separate and distinct from that which resulted from entering into and carrying out the tripartite plan, as were also the damages experienced therefrom. The plaintiff in this respect pressed his case too far. He had a good one against some of the defendants under the tripartite agreement, and another against others under Resolution C, and against some, no doubt, upon both, but not against all; and there was the mistake. A joint tort being charged, not only had it to be proved as laid (Howard v. Union Traction Co., 195 Pa. 391, 45 Atl. 1076; Wiest v. Traction Co., 200 Pa. 149, 49 Atl. 891, 58 L. R. A. 666; Rowland v. Philadelphia, 202 Pa. 50, 51 Atl. 589), but the defendants had all to be liable for all that was resolved upon or done. This, in the view we take of it, was not the case, and the judgment must therefore also be reversed upon this ground.

This reversal is general, and applies to all the defendants, which renders it unnecessary to consider the special argument which was made for some. It will be for the trial judge, when the case comes up again, to determine, in the light of what has been said, how far they and others can be held.

Judgment reversed, and a new trial awarded.