BEACON FRUIT & PRODUCE CO., Inc., et al.

v.

H. HARRIS & CO., Inc., et al.

Civ. A. No. 56–172.

United States District Court
D. Massachusetts.

Feb. 28, 1958.

Lawrence R. Cohen, Joseph Aborn, Boston, Mass., Sigmund Timberg, Washington, D. C., Charles George, Albert R. Mezoff, Boston, Mass., for plaintiff.

Richard Maguire, John L. Saltonstall, Jr., I. J. Silverman, Thomas J. Carens, Boston, Mass., for defendant.

FRANCIS J. W. FORD, District Judge.

A. Procedural History of Case

1. The plaintiffs' complaint, filed on February 27, 1956, alleged that the defendants had combined and conspired unreasonably to restrain and monopolize the marketing and sale of fresh citrus and deciduous fruits in the New England area by imposing and exacting from buyer customers at the wholesale produce auction maintained by the defendant H. Harris & Co., Inc. (hereinafter called "Harris") a five-cent charge per each package of produce sold through the Harris auction, all in violation of Sections 1 and 2 of the Sherman Act (15 U.S.C.A. §§ 1 and 2). The complaint further alleged that the plaintiffs, who are among those who have been required to pay the five-cent charge, are entitled to recover three-fold the charges paid by them under Section 4 of the Clayton Act (15 U.S.C.A. § 15).

2. In addition to Harris, there are three individual defendants; Maurice A. Albertson, William B. Pontefract, and James F. Giovino, who are the three directors and principal officers of Harris.

3. The defendants' answers denied the allegation of the complaint that the Harris auction "is the only market in New England at which citrus and deciduous fruits can be purchased from the packer or grower in less than carload lots"; denied that the defendants had initiated the five-cent charge upon which the complaint is based; admitted that Harris had continued the schedule of charges (including the five-cent charge) previously employed by H. Harris & Co., a partnership whose assets Harris had acquired; and denied that the five-cent charge is in any way unreasonable or illegal.

4. The complaint originally named S. Albertson Company, Inc. as an additional party defendant and co-conspirator. However, on January 21, 1957, the Court granted the motion of S. Albertson Company, Inc. for summary judgment on the basis that, with minor exceptions, neither S. Albertson Company, Inc. nor Harris "has any interest in the business of the other, and the policies of one have no connection with policies of the other."

5. The complaint originally joined 33 business establishments (corporations, partnerships, and individual proprietorships) as parties plaintiff, all of whom were described as buyers at the Harris auction. However, on February 14, 1957, fourteen of these establishments were dismissed with prejudice as parties plaintiff for wilful failure to submit to examination upon deposition.

6. On May 28, 1957, the motions of the plaintiffs and the defendants for summary judgment were denied, D.C., 152 F.Supp. 702, on the basis that there were insufficient facts in the record upon which to support a judgment for either party.

7. On October 18, 1957, the defendants' motion to amend their answers so as to set up the defense of laches and statute of limitations was granted.

8. During the course of the plaintiffs' oral argument in opposition to the defendants' motion to dismiss, made under Rule 41(b), 28 U.S.C.A., at the close of the plaintiffs' case, the plaintiffs moved to amend their complaint to include, *inter alia,* an allegation of breach of fiduciary duty owed by the defendants to the plaintiffs. This motion was granted without objection by the defendants.

#### B. Identification of Parties

9. Harris is engaged in maintaining facilities and furnishing services in connection with the sale of fresh fruit and vegetable produce at the public auction market which it operates, and this has been its sole business since its inception. Harris does not own any produce nor does it act for any persons in the purchase or sale of produce, except that it acts for the sellers in collecting for them the proceeds of sales.

10. The plaintiffs, of whom 19 have remained in the action since February 14, 1957, are primarily wholesale fresh fruit and vegetable jobbers who describe themselves as "buyers" for the purpose of this action. For the most part, these jobbers buy produce for their own account in less than carload lots at various wholesale markets, including the Boston Market Terminal (BMT) and the Harris auction. Sometimes they buy at these markets direct from the grower or packer of the produce, sometimes from the shipper and sometimes from a broker or receiver. The matter of what distributive level the seller is at is of no practical significance to these buyers. In turn, they sell primarily to retail stores, but also to pushcart pedlars, restaurants, hotels, and other institutions. Two of the plaintiffs are primarily brokers—that is, they purchase produce at the wholesale markets, including the Harris auction, for the account of others, collecting a commission for their services.

11. The individual defendants are each engaged in aspects of the produce business separate from the business of Harris. William B. Pontefract, President and Director of Harris, is the owner of Brown, Pontefract, a brokerage company, which is engaged mainly in the purchase of produce in the Boston wholesale markets for the account of produce firms in the Maritime Provinces. A considerable portion of these purchases are undertaken at the Harris auction. Pontefract has been inactive in the Brown Pontefract Company in recent years.

Maurice A. Albertson is General Manager of S. Albertson Company, Inc., a firm of commission merchants engaged in shipping and receiving fresh fruit and vegetable produce to and in various eastern markets. This corporation does very little business at the Harris auction.

James F. Giovino, Vice President and a Director of Harris, is a partner in Giovino Bros., which is a shipper's representative in the sale of produce in the Boston wholesale markets, including the Harris auction, on a commission basis. The business of the firm is largely conducted by Mr. Giovino's brother.

#### C. Economic Background

12. The facilities which Harris maintains consist of a warehouse and office building in the South Boston yards of

the New York, New Haven & Hartford Railroad which it subleases from its subsidiary, H. Harris Realty Co., Inc. In this building are produce warehouse facilities, auction rooms, rooms for buyers and sellers, and miscellaneous offices, including the office of Harris itself. Contiguous to the building are sidings and other facilities for the unloading of freight cars and trucks into the warehouse.

13. Among the services which Harris offers to its customers are the following:

(a) Arrangements with the New Haven Railroad and with trucking concerns for placement of incoming cars and trucks of produce;

(b) Unloading incoming cars and trucks, checking contents against manifests, and segregating and stacking produce in the Harris warehouse according to variety, brand, size, and lot number.

(c) Printing and distribution to sellers and buyers of daily catalogues which describe each lot of produce to be offered for sale during the next auction;

(d) Opening of random crates in each lot for inspection by buyers;

(e) Providing auction personnel and uniform rules for conduct of the auction;

(f) Handling of all billing and accounting procedures among carriers, sellers, and buyers;

(g) Extension of credit to buyers;

(h) Guaranteed protection against loss, damage, errors in manifests, and pilferage;

(i) Delivery of produce to buyer or his assignee.

14. In addition to the Harris auction, the principal wholesale produce markets in Boston are the BMT and the Faneuil Hall Market.

15. BMT is operated by the Boston Market Terminal Company. Transactions at BMT, as at the Harris auction, are primarily in less than carload lots, but are in the form of private, negotiated sales rather than public auction sales. In addition to fruit, a wide line of varieties of vegetable produce is offered for sale at the Boston Market Terminal, whereas at the Harris auction sales of vegetable produce are comparatively small.

16. The Faneuil Hall Market is concerned largely with the offering at privately negotiated sale of native produce at wholesale in less than carload lots.

17. A substantial proportion of the fresh fruit and vegetable produce shipped annually into Boston is shipped directly by the grower or packer, or by his consignee, to large supermarkets and grocery chains. The sales involved in this volume are largely in carload lots. The large supermarkets and chains are in direct competition with the plaintiffs' customers, and the growth of the former has reduced the volume plaintiffs can sell.

18. During the calendar years 1951 through 1955 the number of carloads (including truckloads) of fresh fruit and vegetable produce shipped into the Boston area were as follows:

| Calendar Year | Boston Total | Harris | BMT | Chain Stores & Others |
|---|---|---|---|---|
| 1951 | 45,661 | 4023 (8.8%) | 16,137 (35.34%) | 25,501 (55.86%) |
| 1952 | 46,476 | 3939 (8.5%) | 16,764 (36.07%) | 25,773 (55.43%) |
| 1953 | 48,426 | 4174 (8.6%) | 16,643 (34.36%) | 27,609 (57.04%) |
| 1954 | 49,321 | 5126 (10.4%) | 15,867 (32.17%) | 27,328 (57.43%) |
| 1955 | 47,279 | 5325 (11.3%) | 16,021 (33.89%) | 25,933 (54.81%) |

During the same period the number of carloads (including truckloads) of fresh fruit shipped into the area were as follows:

| Calendar Year | Boston Total | Harris | BMT | Chain Stores & Others |
|---|---|---|---|---|
| 1951 | 13,808 | 4019(29.11%) | 8255(59.78%) | 1534(11.11%) |
| 1952 | 15,712 | 3937(25.05%) | 8210(52.25%) | 3572(22.70%) |
| 1953 | 17,610 | 4159(23.62%) | 7451(42.31%) | 6000(34.07%) |
| 1954 | 17,671 | 4141(23.43%) | 5947(33.65%) | 7583(42.92%) |
| 1955 | 16,761 | 3674(21.92%) | 5406(32.25%) | 7581(45.83%) |

19. For some years the wholesale fresh fruit and vegetable produce business in the Boston area has encountered substantial competition from the frozen and canned fruit and vegetable business and from the canned and concentrated fruit juice business.

### D. Chronology of Events

20. The partnership of H. Harris & Co., which had operated the Harris auction for many years prior to 1951, experienced a serious decline in its volume of business during the years following the war, a situation which was exacerbated by increases in its cost of operation. During the years 1941 through 1950, its volume (expressed in carloads) was as follows:

| | | | |
|---|---|---|---|
| 1941 — 9325 | | 1946 — 4226 |
| 1942 — 6836 | | 1947 — 5671 |
| 1943 — 4650 | | 1948 — 5282 |
| 1944 — 4116 | | 1949 — 4753 |
| 1945 — 3489 | | 1950 — 4024 |

21. In the face of this decline, the Harris partnership determined that it must increase its revenues if it was to continue in business. Accordingly, it discussed with various shippers (sellers) the possibility of increasing the charges paid by the shippers for the privilege of using the facilities and services of the auction. However, these shippers stated that they would not pay increased charges and pointed out that the decline in the volume of the Harris auction was in significant part due to diversion of shipments to other markets by reason of the already high schedule of charges which were collected from shippers by the Harris auction in connection with shipments to it.

22. In 1950, as in years past, shippers of produce to the Harris auction were required to pay percentage commissions on each box or crate of produce sold by them at the auction, the rate varying according to the variety of produce involved, as follows: California and Arizona citrus, 1¾%; Florida and Texas citrus, 2% deciduous fruits, 1¾%; *Exceptions:* pineapples, 2%; watermelons, 3%; other melons, 2½%; Vegetables, 2%; Imports, 2%; Minimum, $15.00; ullages and broken packages, 8%, plus 5¢ per package for moving.

23. These commissions, plus unloading charges (also levied upon shippers) amounting to from $18 to $25 per car, were, with minor exceptions, the only sources of income received by the Harris auction. The buyers were charged nothing for the privilege of doing business at the Harris auction, despite the fact that for many years it has been the practice in most of the other auctions in the principal cities of the United States for the buyers to bear a measure of the cost, including, specifically, unloading charges.

24. Following the unsuccessful talks of the partnership with various shippers, the partnership called in about a dozen of the principal buyers at the auction during the latter part of November, 1950, and explained the partnership's predicament to them. At this meeting the part-

ners proposed to the buyers that they pay a five-cent charge to the Harris partnership for every crate, package, or box purchased by them at the auction, in order that the buyers might bear some measure of the cost of operation and to permit the partnership to attempt to increase the volume of shipments to the auction by excusing the shippers from responsibility for paying unloading charges. Despite expressions of distaste for the proposed five-cent charge, the buyers who attended this meeting concluded that they would go along with the proposal. Following this meeting, and prior to promulgation of the charge, a meeting of the buyers as a whole was held in the auction room of the Harris auction in Charlestown to consider the charge. Again there was some grumbling, but a general acquiescence in the charge by the buyers was manifested.

25. On December 11, 1950, the Harris partnership placed the five-cent charge per package into effect and simultaneously revoked the unloading charge previously made to the shippers. This five-cent charge has remained in effect ever since.

26. Some time during February of 1951, the Harris partnership concluded that despite the institution of the five-cent charge, its losses were such that it could no longer continue in business. Accordingly, during the latter part of February, the partnership let it be known that it was willing to sell the partnership assets. A number of persons became interested in the possibility of purchasing these assets, including some of the customers at the Harris auction (both sellers and buyers) and a New York group.

27. Messrs. Pontefract and Giovino, who were interested in keeping the auction in existence, talked with a number of the Harris auction customers, as well as with other persons in the wholesale produce business, including defendant Albertson, and concluded that there was sufficient interest in investing in a new corporation to purchase the auction to warrant their opening negotiations to this end with the Harris partnership. At some time during the week ending March 21, 1951, Messrs. Pontefract and Giovino talked with Mr. Albertson concerning the possibility of forming a new corporation to take over the partnership assets, and Albertson agreed to join forces with them, provided that the three of them would control 51% of the stock in the new corporation. Albertson was interested in investing in the auction, assuming that control was to be placed in competent hands, since he was convinced on the basis of a conversation with Mr. Dumaine, Sr., of the New Haven Railroad that the auction could be moved to the South Boston yards of the New Haven and operated at a profit there. Pontefract and Giovino agreed to Albertson's conditions.

28. The upshot was that the three men formed a new corporation under the laws of Massachusetts, called Fruit Auction, Inc., in which they became the controlling stockholders, with the balance of the shares being held primarily by customers of the Harris auction. On March 27, 1951, Fruit Auction, Inc. entered into an agreement with the Harris partnership for purchase of the latter's assets at a formula price, plus assumption of partnership losses since January 1, 1951, up to a limit of $12,000. On the closing date specified by this agreement, April 18, 1951, Fruit Auction, Inc., took over the partnership assets (paying the formula sum plus $12,000 therefor) and shortly thereafter it changed its name to H. Harris & Co., Inc.

29. While Pontefract and Giovino, in the process of interesting customers of the old Harris auction (including some of the plaintiffs herein) in investing in the new corporation, told these customers that they were negotiating with the Harris partnership for the purchase of its assets, they made no promise to negotiate on behalf of anyone other than themselves and Mr. Albertson, and they received no promise, benefit or other consideration from anyone in return for conducting such negotiations and organizing the new corporation.

30. Following acquisition of the Harris auction, the defendants made no change in the practices, services, or charges of the Harris auction until September of 1953 when the defendants moved the auction from its place of business in the Charlestown yards of the Boston and Maine Railroad to its present location in the South Boston yards of the New York, New Haven & Hartford Railroad. Effective as of the time of this move, Harris promulgated a new charge of five dollars per car to compensate for the increased rental which Harris was required to pay at the new location. Since September 1, 1953, this charge has been paid by the sellers.

E. Conspiracy: Restraint of Trade

31. The purpose of the individual defendants in organizing Harris and in causing Harris to purchase the assets of the old partnership was to keep the auction in business and to operate it efficiently so that they might have an adequate return on their investment. At all times since their initial consideration of taking over the auction, the individual defendants have expected that Harris would compete with other markets, including especially BMT.

32. In acquiring control of the Harris auction and operating it since 1951, the defendants have neither engaged in predatory business practices nor sought to restrain or monopolize the marketing or sale of fresh fruit or vegetable produce in either the New England or the Greater Boston area.

33. At no time did any of the defendants promise to eliminate or reduce the five-cent charge which had been initiated by the Harris partnership; nor did the partnership require that the five-cent charge be eliminated or reduced as a condition of the sale of its assets.

34. During the period that the individual defendants have controlled the Harris auction, they have operated it at a profit to Harris. They have done so without discriminating in favor of themselves or of their individual companies.

There is no evidence that they have ever taken any action with respect to any matter within Harris' sphere of interest other than as officers and directors of Harris.

35. There is no evidence that the five-cent charge caused or tended to cause: a decrease in the volume of purchases at the auction; a loss in gross or net revenue to the plaintiffs; a decrease in competition among sellers or buyers at the wholesale level; a decrease in the number of buyers at the auction; an increase in prices of citrus or deciduous fruits in the wholesale market in Boston; a discrimination between particular buyers or sellers; or a decrease in the volume of shipments to the Boston area.

36. There is evidence that the five-cent charge, together with the concomitant removal of the unloading charge formerly imposed upon the shippers (sellers), tended to increase the volume done at the Harris auction at the expense of the volume done at the Boston Market Terminal, and therefore tended to increase competition between the Harris auction and the Boston Market Terminal.

37. It is likely that Harris, if it had eliminated or reduced the five-cent charge, would have been unable to obtain compensating revenue from the sellers without substantially reducing the volume of shipments to the auction, and that if the volume of shipments of produce to the Harris auction were substantially reduced, Harris would eventually go out of business.

38. The facilities and services of Harris which are made available to the plaintiffs and other buyers are of substantial benefit to such buyers.

39. The evidence tends to indicate that the amount of the charge made to the buyers (i. e., the five-cent charge) is reasonable and not disproportionate either to the value to the buyers of the facilities and services enjoyed by them or to the cost to Harris of providing those facilities and services.

## F. Monopoly

40. All of the concerns (including the plaintiffs) which normally buy produce at the Harris auction also regularly buy produce at BMT, and most of the sellers at BMT also sell at the Harris auction. Many of the buyers at Harris and BMT also purchase produce at the Faneuil Hall Market. Considerations of comparative price constitute the primary factor in determining whether these concerns satisfy their current requirements at the Harris auction, BMT, or the Faneuil Hall Market. Fluctuation of prices at all three markets is substantially determined by the laws of supply and demand.

41. The Harris auction is in direct competition with BMT and, to the extent that similar produce is sold at the Faneuil Hall Market, in direct competition with Faneuil.

42. The extent to which Harris has effective control over the rate of charges which it makes to its customers (both sellers and buyers) is severely limited by a cross-elasticity of demand for the facilities, services and produce available at the Harris auction, the Boston Market Terminal, and the Faneuil Hall Market.

43. "Sunkist" brand citrus products, which are sold in the Boston area at wholesale and in less than carload lots only at the Harris auction, have a wide public acceptance due to extensive national advertising. They are nevertheless in direct competition in the less-than-carload-lot wholesale market in Boston with other brands of citrus products.

44. There is no evidence as to whether those of the plaintiffs who purchase produce at the Harris auction for their own account have absorbed the five-cent charges in whole or in part or have passed them along to their vendees.

45. While the two plaintiffs who purchase produce at the Harris auction for the account of others may have lost occasional commissions because of inability to fill customers' orders at the maximum price fixed by the customers (after taking into consideration the five-cent charge), these plaintiffs could not even approximate the number or dollar value of such losses, and they admitted that they have no records to substantiate the fact of such losses.

## Conclusions of Law

1. The defendants did not combine or conspire among themselves, or with anyone else, to accomplish anything forbidden by the antitrust laws.

2. The five-cent charge did not impose or constitute a restraint of trade within the meaning of Section 1 of the Sherman Act. It has not tended to suppress competition within the Greater Boston less-than-carload-lot wholesale produce market and was a reasonable charge under all of the circumstances.

3. For the purpose of the Sherman Act, the relevant market, or line of commerce, to be considered in determining whether the Act has been violated is to be defined no more narrowly than as including the business of providing a market place for the purchase and sale of fresh fruit at wholesale in less than carload lots in the Greater Boston area.

4. The defendants have neither exercised nor possessed power over prices or competition in the relevant market, nor have they ever attempted to exercise or acquire such power.

5. Even if the defendants had violated the Sherman Act by imposing or collecting the five-cent charge, the plaintiffs have not been injured in their respective businesses or property within the meaning of Section 4 of the Clayton Act by reason of such charge.

6. Neither Pontefract nor Giovino nor Albertson breached any fiduciary duty to any of the plaintiffs since they stood in no agency relationship, fiduciary or otherwise, with any plaintiff in respect to any transaction disclosed by the evidence.