**ATLANTIC CITY ELECTRIC COM-
PANY et al., Plaintiffs,**

v.

**GENERAL ELECTRIC COMPANY et al.,
Defendants.**

United States District Court
S. D. New York.

Jan. 28, 1964.

See also, D.C., 217 F.Supp. 36.

Kaye, Scholer, Fierman, Hays & Handler, New York City, Milton Handler, James B. Henry, Jr., David Klingsberg, Michael Malina, New York City, of counsel, for plaintiffs Atlantic City Electric Co. et al.

Webster Sheffield Fleischmann Hitchcock & Chrystie, New York City, Bethuel M. Webster, New York City, of counsel, for plaintiffs Atlantic City Electric Co. et al.

Winthrop, Stimson, Putnam & Roberts, New York City, Merrell E. Clark, Jr., James T. Boorsch, B. Brooks Thomas, New York City, of counsel, for plaintiffs Consumers Power Co. et al.

LeBoeuf, Lamb & Leiby, New York City, Taylor R. Briggs, New York City, of counsel, for plaintiffs Consolidated Edison Co. et al.

Isham, Lincoln & Beale, Chicago, Ill., Thomas L. Nicholson, Chicago, Ill., of counsel, for plaintiffs Commonwealth Edison Co. et al.

Louis J. Lefkowitz, New York City, Mathias Lloyd Spiegel, Albany, N. Y., of counsel, for plaintiff People of the State of New York et al.

White & Case, New York City, Green, Hennings, Henry, Evans & Arnold, St. Louis, Mo., Edgar Barton, Edward Wolfe, New York City, Lewis C. Green, St. Louis, Mo., of counsel, for defendant General Electric Co.

Cravath, Swaine & Moore, New York City, Olwine, Connelly, Chase, O'Donnell & Weyher, New York City, Albert R. Connelly, Richard F. DeLima, New York City, of counsel, for defendant Westinghouse Electric Corporation.

Davis, Polk, Wardwell, Sunderland & Kiendl, New York City, Robert B. Fiske, Jr., New York City, of counsel, for defendant Allis-Chalmers Manufacturing Co.

Hughes, Hubbard, Blair & Reed, New York City, Robert J. Sisk, New York City, of counsel, for defendant Allen-Bradley Co.

FEINBERG, District Judge.

Plaintiff utility companies object to the interrogatories of defendant electrical equipment manufacturers and thereby question the validity of the so-called passing-on doctrine in treble damage antitrust suits. Under that doctrine, a purchaser from one who has violated the antitrust laws cannot recover an unlawful overcharge to the extent that the purchaser took into account his increased cost in setting the price to his own customers.

These cases are among the large number of private actions that followed the criminal and civil injunctive proceedings brought by the United States Government against electrical equipment manufacturers in 1960 in the Eastern District of Pennsylvania. The complaints allege a combination and conspiracy by defendant manufacturers to fix prices and rig bids with respect to the sale of specified electrical equipment. Plaintiffs seek to recover treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, in the amount of the difference between prices paid for the electrical equipment bought from defendants and the prices that would have prevailed had there been no conspiracy.

As part of a program of national discovery, defendants General Electric Company, Westinghouse Electric Corporation, and Allis-Chalmers Manufacturing Company have served plaintiffs in this District in one of the product lines involved in these suits [1] with twenty-three interrogatories. These are directed to the economic structure of plaintiffs' companies, with particular emphasis upon rate bases and rates of return thereon. Defendants maintain that the interrogatories are relevant to the issue of damages. Their theory is that the amount of recovery should be reduced to the extent that plaintiffs have passed on any overcharge to their customers by using the cost of electrical equipment "as a determinant of the prices [rates]

1. The product line is steam turbine generators.

charged" for their product (electricity).[2] This is the manner in which excess costs would have been passed on since plaintiffs apparently purchased the equipment not for resale, but only for use in generating electricity.[3] Plaintiffs maintain that they are entitled to recover from defendants the entire amount of an illegal overcharge regardless of whether any such increased costs were passed on to consumers, and that any evidence of such passing on would be immaterial and inadmissible as a matter of law.[4] For purposes of this motion only, it will be assumed that plaintiffs were overcharged as a result of price fixing and that they passed on all or part of their increased costs.

■ Traditionally, a party suing to recover treble damages for a violation of the antitrust laws has been permitted to recover for: (1) loss of profits that could have been earned in a freely competitive market;[5] (2) increased costs of business actually transacted;[6] or (3) decrease in value of investment in tangible or intangible property.[7] It is said that no two categories of injury are necessarily mutually exclusive and that recovery may be had for all three types of damages provided sufficient evidence is introduced to support each claim.[8] It is important to recognize that, as a practical matter, recognition of the passing-on doctrine is tantamount to a repudiation of the "increased costs" measure of

2. Defendants' Memorandum in Opposition to Plaintiffs' Objections to Interrogatories Filed September 13, 1963 [hereinafter cited as "Def. Mem."], p. 8. Alternatively, defendants argue that the passing-on doctrine should not be ruled on now since "the issues can be set forth precisely only after a full factual inquiry has been had, and a complete record has been presented." Def. Mem., p. 48. This contention is without merit. The issue presented is purely a legal one and requires no factual development for its determination. To require plaintiffs to expend substantial time, effort and money to answer these interrogatories would not be justifiable if the information obtained would not be reasonably calculated to lead to the discovery of admissible evidence. Rules 26(b), 33, Fed.R.Civ.P. See Handbook of Recommended Procedures for the Trial of Protracted Cases, 25 F.R.D. 351, 389 (1960).

3. Transcript of oral argument [hereinafter cited as "Tr."], pp. 41, 50–51.

4. Plaintiffs' Memorandum in Support of Objections to Defendants' Interrogatories Relating to the Passing-On Defense [hereinafter cited as "Pl. Mem."], p. 1.

5. E.g., Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652 (1946); Eastman Kodak Co. v. Southern Photo Co., 273 U.S. 359, 376–379, 47 S.Ct. 400, 71 L.Ed. 684 (1927); Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 561–562, 51 S.Ct. 248, 75 L.Ed. 544 (1931).

6. E.g., Thomsen v. Cayser, 243 U.S. 66, 88, 37 S.Ct. 353, 61 L.Ed. 597 (1917);

Chattanooga Foundry & Pipe Works v. City of Atlanta, 203 U.S. 390, 27 S.Ct. 65, 51 L.Ed. 241 (1906); Flintkote Co. v. Lysfjord, 246 F.2d 368, 389–390 (9 Cir.), cert. denied, 355 U.S. 835, 78 S.Ct. 54, 2 L.Ed.2d 46 (1957); Peto v. Howell, 101 F.2d 353, 361 (7 Cir. 1938); Straus v. Victor Talking Mach. Co., 297 F. 791, 803 (2 Cir. 1924); Muskin Shoe Co. v. United Shoe Mach. Corp., 167 F.Supp. 106, 111 (D.Md.1958) (dictum); Alden-Rochelle, Inc. v. A.S.C.A.P., 80 F.Supp. 888, 898 (S.D.N.Y.1948); United States Tobacco Co. v. American Tobacco Co., 163 F. 701, 711–712 (C.C.S.D.N.Y.1908); Loder v. Jayne, 142 F. 1010, 1021 (C.C. E.D.Pa.), rev'd on other grounds, 149 F. 21 (3 Cir. 1906).

7. Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 566–567, 51 S.Ct. 248, 75 L.Ed. 544 (1931).

8. See A. C. Becken Co. v. Gemex Corp., 272 F.2d 1, 5 (7 Cir. 1959), cert. denied, 362 U.S. 962, 80 S.Ct. 878, 4 L.Ed.2d 876 (1960); Flintkote Co. v. Lysfjord, 246 F.2d 368, 390 (9 Cir.), cert. denied, 355 U.S. 835, 78 S.Ct. 54, 2 L.Ed.2d 46 (1957); State Wholesale Grocers v. Great Atl. & Pac. Tea Co., 202 F.Supp. 768, 772–773 (N.D.Ill.1961); Clark, The Treble Damage Bonanza: New Doctrines of Damages in Private Antitrust Suits, 52 Mich.L.Rev. 363, 401 (1954). But see William Goldman Theatres, Inc. v. Loew's, Inc., 69 F.Supp. 103, 105 (E.D. Pa.1946), petition for leave to file a bill of review denied, 163 F.2d 241 (3 Cir. 1947), aff'd per curiam, 164 F.2d 1021 (3 Cir.), cert. denied, 334 U.S. 811, 68 S.Ct. 1016, 92 L.Ed. 1742 (1948).

damages and a limitation of the extent of recovery primarily to lost profits. See Hale & Hale, Market Power: Size and Shape Under the Sherman Act 387 (1958); Note, 61 Yale L.J. 1010, 1023 (1952).[9]

A clear distinction between the increased costs theory of damages in an antitrust case and the loss of profits theory was made in Straus v. Victor Talking Mach. Co., 297 F. 791 (2 Cir. 1924). In that case, plaintiffs were unable to obtain phonograph records at dealers' discounts because they had refused to participate in restrictive licensing arrangements and were compelled to purchase records at retail prices in order to meet the demands of their customers. In a treble damage action, plaintiffs were permitted to recover the amount of "the difference between the established reasonable price and the amounts plaintiffs were compelled to pay * * *." 297 F. at 803. The Court of Appeals for this Circuit made clear that when damages are sought under the overcharge theory, it is irrelevant whether plaintiff's profit margin increased or decreased during the period of the defendant's unlawful activity (Ibid.):

"Plaintiffs contend, and rightly, that they were not forced to sue for damages for loss of profits, and thus run the risk of no recovery, because, plainly, the restrictive arrangement prior to May 1, 1914, furnished no standard of comparison with sales made, or profits increased or lost, by plaintiffs during the period thereafter, when they could sell as they pleased. They contended for a rule of damage which seeks the proximate cause of damage and the proximate result occasioned by that cause. * * * *Whether * * * plaintiffs sold to their customers at a profit or loss becomes immaterial in this case.* They were entitled to goods at the reasonable price thereof. Through no legal fault of theirs, but because of defendants' wrong, they were deprived of their right * * *. It is thus unnecessary to 'go beyond' this 'first step.'" (Emphasis added.) [10]

Although the Court did not refer to the doctrine of passing-on, as such, the clear import of its holding is that passing on of an illegal overcharge is no bar to recovery.[11] The Court of Appeals cited as authority for its conclusions two Supreme Court cases upon which plaintiffs in this case principally rely. Chattanooga Foundry & Pipe Works v. City of Atlanta,

9. Applying the passing-on doctrine, see Clark Oil Co. v. Phillips Petroleum Co., 148 F.2d 580, 583 (8 Cir.), cert. denied, 326 U.S. 734, 66 S.Ct. 42, 90 L.Ed. 437 (1945) ("the action to recover treble damages is not for the amount of the overcharge exacted"); Twin Ports Oil Co. v. Pure Oil Co., 119 F.2d 747, 750 (8 Cir.), cert. denied, 314 U.S. 644, 62 S.Ct. 84, 86 L.Ed. 516 petition for rehearing denied 314 U.S. 711, 62 S.Ct. 176, 86 L. Ed. 567 (1941) ("the basis of the action is for * * * lessened margins, and in the absence of lessened margins, there can be no recoverable damages" notwithstanding the statement of plaintiff's counsel that the case had been tried on the "illegal exaction theory" and not the "margin theory").

10. Straus was cited with approval by the Supreme Court for the proposition that "[t]he constant tendency of the courts is to find some way in which damages can be awarded where a wrong has been done. Difficulty of ascertainment is no longer confused with right of recovery." Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 565–566, 51 S.Ct. 248, 251, 75 L.Ed. 544 (1931).

11. In its brief in the Court of Appeals, defendant unsuccessfully contended that the trial judge had erroneously excluded evidence of plaintiff's profits on the sale of defendant's products. It urged that: "Evidence * * * which a defendant has offered tending to show that a loss claimed by a plaintiff was actually only an apparent loss, or a temporary loss, or a mere bookkeeping loss, which the plaintiff in the course of his business has actually recouped or could reasonably have recouped, is obviously evidence that is directly relevant to the issue whether the plaintiff has actually and ultimately been 'injured in his business or property'. * * *" Brief on Behalf of Defendant Victor Talking Mach. Co., pp. 140–141.

203 U.S. 390, 27 S.Ct. 65, 51 L.Ed. 241 (1906) and Southern Pac. Co. v. Darnell-Taenzer Lumber Co., 245 U.S. 531, 38 S. Ct. 186, 62 L.Ed. 451 (1918).

Chattanooga was a suit by the City of Atlanta to recover overcharges in the purchase of iron water pipe used in its waterworks. The Supreme Court affirmed a verdict "for the difference between the price paid and the market or fair price that the city would have had to pay" in the absence of the unlawful combination. 203 U.S. at 396, 27 S.Ct. at 66. The Court held, in an opinion written by Mr. Justice Holmes, that the City had been injured in its property within the meaning of Section 7 of the Sherman Act [12] (203 U.S. at 396, 27 S.Ct. at 66):

"[The City of Atlanta] was injured in its property, at least, if not in its business of furnishing water, by being led to pay more than the worth of the pipe. A person whose property is diminished by a payment of money wrongfully induced is injured in his property."

The situation in Chattanooga was substantially identical to the one before this Court. Both the present plaintiffs and the City of Atlanta operated utilities and sold their services to the public. Both were overcharged in the purchase of equipment necessary to produce their product (electricity and water, respec-

tively). The Supreme Court in Chattanooga held that a verdict for the City in the amount of the overcharge was proper on proof of the illegal conspiracy and the overcharge.

Defendants attempt to minimize the effect of Chattanooga, pointing out that the passing-on issue was not there briefed or argued.[13] However, Mr. Justice Holmes later made explicit what was implicit in his opinion in Chattanooga. Twelve years later, the Supreme Court specifically rejected the passing-on defense in Darnell-Taenzer. This was a suit brought to recover freight rate overcharges from defendant railroads under the Interstate Commerce Act. The trial judge initially had directed a verdict for defendants on the ground that plaintiffs had not been damaged. The judgment was reversed by the Court of Appeals for the Sixth Circuit [14] and remanded for a new trial, at which the jury was instructed that if they found the rate charged unreasonable, and that prescribed by the Interstate Commerce Commission reasonable, they should find for the plaintiffs in accordance with the award made by the Commission. The award was in the amount of the difference between the freight rate to which plaintiffs were entitled and the rate they were compelled to pay.[15] The jury found for plaintiffs and the judgment was af-

12. Section 7 of the Act of 1890, 26 Stat. 210 was the substantially identical predecessor of § 4 of the Clayton Act, 38 Stat. 731 (1914), 15 U.S.C. § 15, the provision under which plaintiffs are suing here.

13. Def. Mem., p. 27.

14. 221 F. 890 (6 Cir. 1915).

15. The Commission reduced the rate from 85 to 75 cents per 100 pounds and ordered reparation to the extent of the excess, stating:

"[T]he advance in the freight rate has been added to the price paid by the consumer. The defendants say that it follows that the complainants who have paid this freight rate have not actually been injured. * * * Such is not, in our opinion, the proper meaning of this term. These complainants were * * * entitled to a reasonable rate from the defendants for the service of transporta-

tion. An unreasonable rate was in fact exacted. They were thereby deprived of a legal right and *the measure of their damage is the difference between the rate to which they were entitled and the rate which they were compelled to pay.* If complainants were obliged to follow every transaction to its ultimate result and to trace out the exact commercial effect of the freight rate paid, it would never be possible to show damages with sufficient accuracy to justify them. Certainly these defendants are not entitled to this money which they have taken from the complainants, and they ought not to be heard to say that they should not be required to refund this amount because the complainants themselves may have obtained some portion of this sum from the consumer. * * * The burden of an unjust freight rate usual-

firmed by the Court of Appeals.[16] In upholding the jury's verdict, the Supreme Court stated, again per Mr. Justice Holmes (245 U.S. at 533–534, 38 S.Ct. at 186):

"The only question before us is that at which we have hinted: whether the fact that the plaintiffs were able to pass on the damage that they sustained in the first instance by paying the unreasonable charge, and to collect that amount from the purchasers, prevents their recovering the overpayment from the carriers. The answer is not difficult. The general tendency of the law, in regard to damages at least, is not to go beyond the first step. As it does not attribute remote consequences to a defendant so it holds him liable if proximately the plaintiff has suffered a loss. The plaintiffs suffered losses to the amount of the verdict when they paid. Their claim accrued at once in the theory of the law and it does not inquire into later events. * * * The carrier ought not to be allowed to retain his illegal profit, and the only one who can take it from him is the one that alone was in relation with him, and from

whom the carrier took the sum. * * * Behind the technical mode of statement is the consideration well emphasized by the Interstate Commerce Commission, of the endlessness and futility of the effort to follow every transaction to its ultimate result. * * * Probably in the end the public pays the damages in most cases of compensated torts."

Both Section 4 of the Clayton Act, 15 U.S.C. § 15,[17] under which plaintiffs sue here, and the relevant sections of the Interstate Commerce Act, 49 U.S.C. §§ 8 and 16(2),[18] involved in Darnell-Taenzer, allow recovery only for "damages" sustained as a result of the violation. The language of the Court in Darnell-Taenzer was not confined to the measure of recovery under the Interstate Commerce Act but was extremely broad. The Court referred to "[t]he general tendency of the law, in regard to damages," and, again in general terms, to the fact that "[p]robably in the end the public pays the damages in most cases of compensated torts." 245 U.S. at 533–534, 38 S. Ct. at 186. It also indicated that the general rule which prevents attributing "remote consequences" to a defendant [19] has as its corollary the proposition that

ly rests upon the consumer, who can not and does not recover."
Burgess v. Transcontinental Freight Bureau, 13 I.C.C. 668, 679–680 (1908). (Emphasis added.)

16. 229 F. 1022 (6 Cir. 1916).

17. "Any person *who shall be injured* in his business or property by reason of anything forbidden in the antitrust laws may sue therefor * * * and shall recover threefold *the damages by him sustained* * * *." (Emphasis added.)

18. Section 8 provides:
"In case any common carrier subject to the provisions of this chapter shall do, cause to be done, or permit to be done any act, matter, or thing in this chapter prohibited or declared to be unlawful, or shall omit to do any act, matter, or thing in this chapter required to be done, such common carrier *shall be liable to the person or persons injured thereby for the full amount of damages sustained* * * *." (Emphasis added.)

Section 16(2) provides:
"If a carrier does not comply with an order for the payment of money within the time limit in such order, the complainant, * * * may file in the district court of the United States * * * a complaint setting forth briefly the causes for which he claims *damages*, and the order of the commission in the premises. Such suit * * * shall proceed in all respects like other civil suits for *damages*, except that on the trial of such suit the findings and orders of the commission shall be prima facie evidence of the facts therein stated, * * *." (Emphasis added.)
See Meeker & Co. v. Lehigh Valley R. R., 236 U.S. 412, 417, 428–430, 35 S.Ct. 328, 59 L.Ed. 644 (1915).

19. See Pollack, The "Injury" and "Causation" Elements of a Private Antitrust Action, 21 A.B.A. Section of Antitrust Law 341, 349–53, and cases collected therein, for discussion of the general rule that only those persons at whom an antitrust

a defendant will be held liable to a plaintiff which it causes to suffer a proximate loss; otherwise a defendant could escape civil liability altogether. Id., 245 U.S. at 534, 38 S.Ct. at 186. If passing on of costs did not prevent plaintiffs from recovering the overcharge in Darnell-Taenzer, this Court perceives no reason why it should prevent plaintiffs from recovering here. Hanover Shoe, Inc. v. United Shoe Mach. Corp., 185 F.Supp. 826 (M.D.Pa.), aff'd per curiam, 281 F. 2d 481 (3 Cir.), cert. denied, 364 U.S. 901, 81 S.Ct. 234, 5 L.Ed.2d 194 (1960); cf. Central States Elec. Co. v. City of Muscatine, 324 U.S. 138, 145, 65 S.Ct. 565, 89 L.Ed. 801 (1945), stating in *dictum* that if a natural gas distribution utility sued a natural gas producer utility to recover excessive rates, the producer could not defend on the ground that the distributor had passed on the excess to its consumers, and citing Darnell-Taenzer.

Defendants seek to distinguish Darnell-Taenzer on the ground that a reparation order of the Interstate Commerce Commission is enforced without "any" factual inquiry into the "pecuniary loss" of the plaintiff, whereas the right of recovery under the Clayton Act is dependent upon specific proof of pecuniary loss.[20] This alleged distinction rests upon the erroneous premise that the Supreme Court in Darnell-Taenzer enforced the Commission's order without requiring any showing of the pecuniary loss suffered by plaintiffs. In fact, Mr. Justice Holmes in Darnell-Taenzer specifically stated that "[t]he plaintiffs suffered *losses* to the amount of the verdict when they paid [the overcharge]," 245 U.S. at

534, 38 S.Ct. at 186, and the Circuit Court had held that "the amounts awarded represent[ed] the *actual pecuniary loss* of the respective plaintiffs." 221 F. 890, 892 (6 Cir. 1915). (Emphasis added.) If by their assertion that proof of pecuniary loss is required under the Clayton Act, defendants mean to say that plaintiffs must show loss of profits, then their statement merely reformulates the basic issue presented here, that is, whether plaintiffs may use increased costs as a separate and distinct measure of damages without regard to gain or loss of revenue.[21] The real significance of Darnell-Taenzer is that, in a suit to recover an unlawful overcharge, no more specific proof of pecuniary loss than proof of the overcharge itself was required of plaintiffs, and the amount of the excess exacted represented the damages sustained.[22] This is precisely the theory of recovery which plaintiffs urge here.

Defendants urge that the controlling authority in the Supreme Court is not Chattanooga or Darnell-Taenzer, but Keogh v. Chicago & N.W. Ry., 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922). In Keogh, plaintiff manufacturer of excelsior and flax tow alleged that defendant railroads had conspired to fix uniform freight rates in violation of the Sherman Act. The rates charged had been approved as reasonable by the Interstate Commerce Commission. Plaintiff claimed, however, that the rates would have been lower absent the conspiracy, and sought to recover the difference between the rates actually charged and those that would have prevailed under competitive conditions. One of the reasons given by the Court for denying re-

violation is directed—those in the "target area"—have standing to sue.

20. Def. Mem., pp. 28–30.

21. See notes 5–8 supra and accompanying text.

22. See Adams v. Mills, 286 U.S. 397, 406–408, 52 S.Ct. 589, 76 L.Ed. 1184 (1932); Louisville & N. R. R. v. Sloss-Sheffield Steel & Iron Co., 269 U.S. 217, 235, 46 S.Ct. 73, 70 L.Ed. 242 (1925) (comment-

ing on Darnell-Taenzer); Meeker & Co. v. Lehigh Valley R.R., 236 U.S. 412, 428–430, 35 S.Ct. 328, 59 L.Ed. 644 (1915). Admittedly, the Supreme Court has not always been consistent in its terminology, see Pennsylvania R.R. v. Int'l Coal Mining Co., 230 U.S. 184, 202, 33 S.Ct. 893, 898, 57 L.Ed. 1446 (1913) (a plaintiff seeking to enforce a reparation order of the ICC can recover the excess, "not as damages but as overcharge").

covery was the speculative nature of the damages alleged (Id., 260 U.S. at 165, 43 S.Ct. at 50):

"[This case] is not like those cases where a shipper recovers from the carrier the amount by which its exaction exceeded the legal rate. Southern Pacific Co. v. Darnell-Taenzer Co., 245 U.S. 531 [38 S.Ct. 186, 62 L.Ed. 451]. Here the instrument by which the damage is alleged to have been inflicted is the legal rate, which, while in effect, had to be collected from all shippers. Exaction of this higher legal rate may not have injured Keogh at all; for a lower rate may not have benefited him. Every competitor was entitled to be put—and we must presume would have been put—on a parity with him. And for every article competing with excelsior and tow, like adjustment of the rate must have been made. Under these circumstances no court or jury could say that, if the rate had been lower, Keogh would have enjoyed the difference between the rates or that any other advantage would have accrued to him. *The benefit might have gone to his customers, or conceivably, to the ultimate consumer.*" (Emphasis added.)

Defendants claim that the last sentence of the quoted text is a specific recognition by the Supreme Court of the passing-on doctrine. However, "the sole question for decision" in Keogh was "whether there * * * [was] a cause of action under § 7 of the Anti-Trust Act * * *." Id., 260 U.S. at 161, 43 S.Ct. at 49. The Court held that the Interstate Commerce Commission had exclusive jurisdiction over the subject matter of the action and that, therefore, there was no antitrust cause of action. The statement emphasized by defendants related to the speculative nature of damages on the assumption that there was an antitrust cause of action and, therefore, was *dictum.* Moreover, the author of the opinion (Mr. Justice Brandeis) some ten years later, in addressing himself more fully to the question, repudiated the passing-on doctrine in a suit under the Interstate Commerce Act for an unlawful overcharge. In Adams v. Mills, 286 U.S. 397, 52 S.Ct. 589, 76 L.Ed. 1184 (1932), plaintiff consignees of shipments sued for freight overcharges and were met with the contention that they had passed on the expense to the shippers. Mr. Justice Brandeis wrote (Id., 286 U.S. at 407, 52 S.Ct. at 591):

"The plaintiffs were the consignees of the shipments and entitled to possession of them upon payment of the lawful charges. If the defendants exacted from them an unlawful charge, the exaction was a tort, for which the plaintiffs were entitled, as for other torts, to compensation from the wrongdoer. * * * Neither the fact of subsequent reimbursement by the plaintiffs from funds of the shippers, nor the disposition which may hereafter be made of the damages recovered, is of any concern to the wrongdoers. * * * The plaintiffs have suffered injury within the meaning of § 8 of the Interstate Commerce Act; and the purpose of that section would be defeated if the tortfeasors were permitted to escape reparation by a plea that the ultimate incidence of the injury was not upon those who were compelled in the first instance to pay the unlawful charge."

For these reasons, it would seem that Keogh does not appreciably diminish the force of Chattanooga and Darnell-Taenzer.

Defendants also rely on a number of other decisions to show that the passing-on doctrine is "the universal rule under the antitrust laws."[23] Thus, defendants cite Enterprise Industries, Inc. v. Texas Co., 240 F.2d 457 (2 Cir.), cert. denied, 353 U.S. 965, 77 S.Ct. 1049, 1 L.Ed.2d 914 (1957), in which the Court of Appeals for this Circuit applied the concept of

23. Def. Mem., p. 9.

passing-on to a treble damage action for alleged price discrimination in violation of the Robinson-Patman Act. Defendants urge that extension of the rationale of Darnell-Taenzer to a treble damage suit for alleged overcharges in violation of the Sherman Act is inconsistent with the holding of the Circuit Court in Enterprise. However, Enterprise expressly adopted the distinction between overcharge and discrimination made by the Supreme Court in Interstate Commerce Comm'n v. United States, 289 U.S. 385, 53 S.Ct. 607, 77 L.Ed. 1273 (1933), quoted in part, 240 F.2d 459–460. The Supreme Court had pointed out in Interstate that discrimination alone does not injure a disfavored buyer of defendant's services or goods unless the favored buyers use their competitive advantage to divert customers from the disfavored buyer or force him to sell at a lowered price in order to retain his customers (289 U.S. at 390–391, 53 S.Ct. at 609–610):

> "Overcharge and discrimination have very different consequences, and must be kept distinct in thought. * * * If by reason of the discrimination, the preferred producers have been able to divert business that would otherwise have gone to the disfavored shipper, damage has resulted to the extent of the diverted profits. If the effect of the discrimination has been to force the shipper to sell at a lowered market price * * * damage has resulted to the extent of the reduction. But none of these consequences is a necessary inference from discrimination without more." (Emphasis added.)

But, the Court explained, when the rate or price exacted of a purchaser is itself unlawfully excessive, he is damaged immediately and directly by having to pay more for the service or commodity than he would have to pay in a freely competitive market, and in this situation "there may be recovery of the overcharge without other evidence of loss." Id., 289 U. S. at 390, 53 S.Ct. at 609. Enterprise, therefore, is not at all inconsistent with application of Darnell-Taenzer to a suit for illegal overcharge.

Defendants state that the passing-on doctrine "has been specifically adopted in antitrust cases" by the Court of Appeals in seven Circuits.[24] However, with the exception of a series of cases in the Seventh and Eighth Circuits, usually referred to as the oil jobber cases, and with the possible exception of Wolfe v. National Lead Co., 225 F.2d 427 (9 Cir.), cert. denied, 350 U.S. 915, 76 S.Ct. 198, 100 L.Ed. 802 (1955),[25] there do not appear to be any Circuit Court decisions squarely holding passing on a defense to a suit to recover treble damages for increased costs due to prices illegally fixed under the Sherman Act. The cases cited in defendants' brief contain only dicta[26] or involve allegedly discriminatory practices in violation of the Robin-

---

24. Def. Mem., p. 21.

25. It has been asserted that Wolfe is not a holding, but only dictum. Hanover Shoe, Inc. v. United Shoe Mach. Corp., 185 F.Supp. 826, 831 n. 12 (M.D.Pa. 1960). But see Note, 70 Yale 469, 473 n. 33 (1961). In any event, for an indication in the same Circuit that passing-on is not a valid defense, see Flintkote Co. v. Lysfjord, 246 F.2d 368, 389–390 (9 Cir.), cert. denied, 355 U.S. 835, 78 S.Ct. 54, 2 L.Ed.2d 46 (1957).

26. Miller Motors, Inc. v. Ford Motor Co., 252 F.2d 441, 448 (4 Cir. 1958) (no Sherman Act violation found); Beacon Fruit & Prod. Co. v. H. Harris & Co., 160 F.Supp. 95, 102 (D.Mass.), aff'd per curiam, 260 F.2d 958 (1 Cir. 1958), cert. denied, Goldman v. H. H. & Co., 359 U.S. 984, 79 S.Ct. 942, 3 L.Ed.2d 933 (1959) (no Sherman Act violation found); Turner Glass Corp. v. Hartford-Empire Co., 173 F.2d 49, 51–53 (7 Cir.), cert. denied, 338 U.S. 830, 70 S.Ct. 57, 94 L.Ed. 505, petition for rehearing denied, 338 U.S. 881, 70 S.Ct. 154, 94 L.Ed. 541 (1949) (licensing agreements "were not inherently illegal").

Although this Court held passing on a defense in Banana Distribs. Inc. v. United Fruit Co., 162 F.Supp. 32, 47–48 (S. D.N.Y.1958), rev'd on other grounds, 269 F.2d 790 (2 Cir. 1959), that case will not be followed here for the reasons indicated in the text.

son-Patman Act,[27] and are, therefore, distinguishable.[28]

The oil jobber cases are clearly the principal authority for defendants' position. Following the successful prosecution of a number of major oil companies for conspiring to fix the retail prices of gasoline by establishing a floor under the spot market (jobber) prices,[29] civil actions were brought by various jobbers. Plaintiff jobbers had purchased gasoline from defendant oil companies and had been able to maintain a fixed markup because defendants controlled not only the price of the gasoline sold to plaintiffs, but also the price at which plaintiffs resold to their customers (*i. e.*, gasoline service stations). In fact, the formula under which the oil companies sold gasoline to the jobbers was computed with the service station price as the starting point.[30] Plaintiffs, therefore, were held to have suffered no pecuniary loss since they were able to sell gasoline without diminution of their normal margin of profit, and recovery was denied. Clark Oil Co. v. Phillips Petroleum Co., 148 F.2d 580 (8 Cir.), cert. denied, 326 U.S. 734, 66 S.Ct. 42, 90 L.Ed. 437 (1945); Northwestern Oil Co. v. Socony-Vacuum Co., 138 F.2d 967 (7 Cir. 1943), cert. denied, 321 U.S. 792, 64 S.Ct. 790, 88 L.Ed. 1081 (1944); Twin Ports Oil Co. v. Pure Oil Co., 119 F.2d 747 (8 Cir.), cert. denied, 314 U.S. 644, 62 S.Ct. 84, 86 L.Ed. 516, petition for rehearing denied, 314 U.S. 711, 62 S.Ct. 176, 86 L.

Ed. 567 (1941); Leonard v. Socony-Vacuum Oil Co., 42 F.Supp. 369 (W.D. Wisc.), appeal dismissed, 130 F.2d 535 (7 Cir. 1942).

The oil jobber cases were distinguished in the recent case of Hanover Shoe, Inc. v. United Shoe Mach. Corp., 185 F.Supp. 826 (M.D.Pa.), aff'd per curiam, 281 F. 2d 481 (3 Cir.), cert. denied, 364 U.S. 901, 81 S.Ct. 234, 5 L.Ed.2d 194 (1960), a treble-damage suit by a manufacturer of shoes against a lessor of shoe manufacturing equipment, on the ground that the oil jobber cases involved middlemen who were selling a product supplied for resale by a Sherman Act violator, whereas plaintiff in Hanover was simply a lessee of equipment who manufactured its own product. See Freedman v. Philadelphia Terminals Auction Co., 301 F.2d 830 (3 Cir.), cert. denied, 371 U.S. 829, 83 S.Ct. 40, 9 L.Ed.2d 67 (1962) (reaffirming the so-called "middleman-consumer" distinction). Hanover and Freedman have been cited and relied on in an order entered in the Eastern District of Pennsylvania on December 16, 1963, by Chief Judge Clary and Judge Lord, sustaining plaintiffs' objections to defendants' passing-on interrogatories in the electrical equipment suits filed in that district.

The "middleman-consumer" distinction has been criticized as having "no economic significance" since a consumer (*i. e.*, a manufacturer) can, as effectively as a pure middleman, recover an excessive

27. Enterprise Industries, Inc. v. Texas Co., 240 F.2d 457 (2 Cir.), cert. denied, 353 U.S. 965, 77 S.Ct. 1049, 1 L.Ed.2d 914 (1957). The same distinction applies to Kidd v. Esso Standard Oil Co., 295 F.2d 497 (6 Cir. 1961), cited by defendants to show that the passing-on doctrine has been "specifically recognized" in the Sixth Circuit, Def. Mem., p. 13. Defendants also cite Freedman v. Philadelphia Terminals Auction Co., 301 F.2d 830 (3 Cir.), cert. denied, 371 U.S. 829, 83 S.Ct. 40, 9 L.Ed.2d 67 (1962) to show that the passing-on doctrine has been adopted in the Third Circuit. In this case, the Court clearly reaffirmed rejection of the passing-on doctrine where a "consumer" rather than a "middleman" is involved. The distinction is discussed at the text ac-

companying note 31 infra. Freedman also appears to be distinguishable as a discrimination type case since it involved an alleged violation of § 2(c) of the Robinson-Patman Act. See Federal Trade Comm'n v. Henry Broch & Co., 363 U.S. 166, 176, 80 S.Ct. 1158, 4 L.Ed.2d 1124 (1960).

28. See pp. 66 and 67 supra.

29. United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940).

30. See Twin Ports Oil Co. v. Pure Oil Co., 119 F.2d 747 (8 Cir.), cert. denied, 314 U.S. 644, 62 S.Ct. 84, 86 L.Ed. 516, petition for rehearing denied, 314 U.S. 711, 62 S.Ct. 176, 86 L.Ed. 567 (1941).

price by raising the price of the commodity he sells.[31] However, proof of the manner in which increased cost is passed on is unquestionably more difficult in the case of a manufactured article than in the oil jobber cases. With a manufacturer (in the instant case, of electricity), the cost of the item bought from defendant is only one of many variable factors in the determination of the price of the finished product to the consumer.[32] Moreover, recouping of the excessive cost depends upon how well the plaintiff manufacturer performs in his own business, with the accounting [33] and evidentiary problems this raises. In the oil jobber cases, the effect of the increased cost on the price of gasoline and the manner in which the increased cost was recouped were both easily identifiable.

The oil jobber cases may also be distinguished by the difference between the relatively short period of time in which the jobbers were able to recoup their increased costs and the much longer period (e. g., thirty years for depreciation of turbines) [34] over which plaintiffs here must recoup the overcharge to them. Thus, in addition to the severe problems of proof posed by passing on in this case, the fact still remains that, even if the likelihood of eventual passing on could be proved, plaintiffs will have been deprived for a long period of time of capital which they could have used for other purposes. Cf. Hanover Shoe, Inc. v. United Shoe Mach. Corp., supra, 185 F. Supp. at 829. Still another possible distinction arises out of the fact in the oil jobber cases that defendant oil companies controlled the price at which plaintiff jobbers sold gasoline to their customers. Thus, defendant oil companies might also have been subjected to suits by these customers, as well as by plaintiff jobbers, raising the specter of multiple liability were passing-on not applied to the suits brought by the jobbers.[35]

The District Court for the Northern District of Illinois, Eastern Division, primarily on the authority of Chattanooga, has sustained plaintiffs' objections to defendants' interrogatories in the electrical equipment suits filed in that district. Judge Robson distinguished the oil jobber cases on the following grounds:

"(1) Plaintiffs in those cases were true middlemen; here they are consumers. * * * (2) The parties in those cases were more closely related than the usual buyer and seller. Often the defendants guaranteed plaintiffs' profit margins. In these cases ordinary buyer-seller relationships exist. (3) Whereas the jobbers resold the gasoline intact, the utilities use the equipment to produce and/or distribute electricity. (4) The risks cast on the jobbers by higher gasoline prices were de minimis and short term. In contrast the risks which would be created for the utilities by higher equipment prices could be significant and would extend over the lives of the capital equipment involved. (5) Finally, gasoline consumers were thought to have independent rights under the antitrust laws to bring suits against the oil companies which could negate the existence of such rights in the middlemen. On the other hand, the consumers of electricity apparently have no such rights." [36]

■ Thus, it is apparent that there are grounds for confining the oil jobber cases to their facts. In any event, I base

31. Note, 110 U.Pa.L.Rev. 1118, 1127 (1962); Note, 70 Yale L.J. 469, 476 (1961).

32. See Barnes, The Economics of Public Utility Regulation 601–03 (1942).

33. See, e.g., Bonbright, Principles of Public Utility Rates 212 (1961).

34. Tr. pp. 55–56.

35. See Clark Oil Co. v. Phillips Petroleum Co., supra note 9, 148 F.2d at 582–583; Note, 110 U.Pa.L.Rev. 1118, 1128 (1962).

36. Commonwealth Edison Co. v. Allis-Chalmers Mfg. Co., United States District Court, Northern District of Illinois, Eastern Division, 225 F.Supp. 332. (Footnotes omitted.) This Court has been advised that Judge Robson has certi-

my conclusions primarily on the decisions of the Supreme Court in Darnell-Taenzer and Chattanooga, the decision of the Court of Appeals for this Circuit in Straus, the line of cases holding that increased costs are a proper measure of damages,[37] and the more recent opinions of the Supreme Court and the policy considerations discussed below. These indicate that the passing on of an unlawful overcharge does not preclude recovery of increased costs, and if the oil jobber cases are not adequately distinguishable, then they are inconsistent with what appears to be more compelling authority.

Defendants maintain that if plaintiffs are permitted to recover treble damages notwithstanding the passing on of the overcharges, they will receive a "windfall." [38] Defendants are hardly in a position to urge this objection since recognition of the passing-on defense will result in a windfall to them, and if there is to be a windfall in any case, it is plaintiffs, and not defendants, who should receive it. Cf. Federal Power Comm'n v. Interstate Natural Gas Co., 336 U.S. 577, 69 S.Ct. 775, 93 L.Ed. 895 (1949).[39] Were the consumers a proper party in these proceedings,[40] it might be urged by defendants that the Court should equitably distribute the damages between the utilities and the consumers, cf. Interstate Natural Gas Co., supra, but when the only parties to the suit are the equipment manufacturers and the immediate purchaser-utilities, the manufacturers should not be able to prevent the utilities from recovering from them the amount of the overcharges because the utilities have passed them on to the ultimate consumers in the form of higher rates, see Adams v. Mills, 286 U.S. 397, 407, 52 S. Ct. 589, 76 L.Ed. 1184 (1932); cf. Central States Elec. Co. v. City of Muscatine, 324 U.S. 138, 145–146, 65 S.Ct. 565, 89 L.Ed. 801 (1945); Federal Power Comm'n v. Interstate Natural Gas Co., supra, 336 U.S. at 590–595, 69 S.Ct. at 782–784 (separate opinion of Jackson, J.).

Moreover, it is not necessarily true that plaintiffs will receive a complete "windfall" if they are permitted to recover the amount of the overcharge without regard to the extent to which they have passed on the excess to their customers. Cf. Tampa Elec. Co. v. Nashville Coal Co., 214 F.Supp. 647, 655–657 (M.D. Tenn.1963). There is some indication that were plaintiffs to recover here, they would be required by the state regulatory commissions to reduce the carrying value of the assets involved by the amount of the overcharge recovered. See Note, 110 U.Pa.L.Rev. 1118, 1131 and n. 82 (1962); cf. Pennsylvania Water & Power Co. v. Federal Power Comm'n, 92 U.S. App.D.C. 125, 203 F.2d 219 (D.C.Cir. 1953). Such a reduction in the rate base might result in lower rates to the consumer, and, in any event, would prevent the possibility of any future injury to the consumer by reason of inflated carrying values. With respect to the trebling increment of the recovery, all, or a portion of it, might, in some cases, accrue to the benefit of the con-

fied this decision for appeal and that the Court of Appeals for the Seventh Circuit has permitted an appeal to be taken.

37. See note 6, supra. It is true that the group of cases collected in footnote 6 did not discuss the passing-on doctrine as such. They are clearly opposed in principle, however, to the rationale of the oil jobber decisions.

38. Def. Mem. pp. 1–2.

39. Interstate Gas involved the proper disposition to be made of a fund impounded by the Court of Appeals for the Fifth Circuit pending judicial review of an order of the Federal Power Commission directing a company producing natural gas to reduce its rates on interstate sales of natural gas for resale. Although there was a sharp dispute within the Court as to whether the fund should be distributed to the gas utility companies that had resold to the ultimate consumers, or to the ultimate consumers themselves, the entire Court was unanimous on the point that, in any event, the producer who had charged the unreasonable rates was not entitled to any portion of the fund. See 336 U.S. at 584, 587, 595, 600 n. 7, 69 S. Ct. at 779, 780, 784, 787, 93 L.Ed. 895.

40. But see note 41 infra and accompanying text.

sumers. See Philadelphia Elec. Co. v. Westinghouse Elec. Corp., 308 F.2d 856, 858 (3 Cir. 1962), cert. denied, 372 U.S. 936, 83 S.Ct. 883, 9 L.Ed.2d 767 (1963) (indicating the view of the Pennsylvania Public Utility Commission); Note, 110 U.Pa.L.Rev. 1118, 1132 and n. 88 (recording results of survey of state regulatory commissions).

■ Finally, the most significant consideration is the strong policy in favor of private treble-damage actions, which are intended not only to compensate those injured by violations of the antitrust laws, but also to function as an independent method of enforcing antitrust policy. The Supreme Court has noted, in United States v. Borden Co., 347 U.S. 514, 518, 74 S.Ct. 703, 706, 98 L.Ed. 903 (1954):

> "The private-injunction action, like the treble-damage action under § 4 of the Act, supplements government enforcement of the antitrust laws; * * *. These private and public actions were designed to be cumulative, not mutually exclusive."

See Report of The Attorney General's National Committee To Study The Antitrust Laws 378 (1955). It has been held that the ultimate consumers of electricity sold by plaintiffs here have no independent standing to sue these defendants for violation of the antitrust laws.[41] Therefore, to the extent that there has been passing on of increased costs, recognition of the passing-on doctrine in these suits would insulate defendants from any recovery, even though they may have conspired and overcharged as alleged. Moreover, in a regulated industry, the mechanism of rate-making enables a utility to increase rates when its costs rise. In an unregulated industry, an individual may, because of competition, be unable to raise prices to reflect increased costs. Recognition of passing-on as a defense here would then result in an anomaly; i. e., the mechanism of rate making would have the effect of protecting antitrust law violators while placing the ultimate burden of loss upon the consumers, the very individuals whose interests public utility regulation is designed to protect.

Finally, every manufacturer of goods or services attempts to take into account the cost of the equipment and raw materials he buys in setting the price at which he sells his product and, to the extent he succeeds, such costs are passed on. If the prices a manufacturer pays for equipment or raw materials are illegally fixed, he would ordinarily have a greater financial incentive and ability to sue those who fixed the price than the persons to whom he sells, some of whom may be the ultimate consumers. If only the manufacturer's customers can recover the passed on costs, those who illegally fix prices would, as a practical matter, to that extent be protected from liability. Such a result has little to commend it [42] and should be reached only if controlling precedents require it. It is my opinion that they do not, and, in fact, point the other way.

■ For the foregoing reasons, plaintiffs' objections to defendants' passing-on interrogatories are sustained.

Settle order on notice.

41. Commonwealth Edison Co. v. Allis-Chalmers Mfg. Co., 207 F.Supp. 252 (N. D.Ill.1962), aff'd, 315 F.2d 564 (7 Cir. 1963); Philadelphia Elec. Co. v. Westinghouse Elec. Corp., District Court for the Eastern District of Pennsylvania, oral opinion quoted in part and affirmed on other grounds, 308 F.2d 856, 858 (3 Cir. 1962), cert. denied, Pennsylvania Public Utility Comm. v. Westinghouse Elec. Corp., 372 U.S. 936, 83 S.Ct. 883, 9 L.Ed.2d 767 (1963).

42. It is not necessary to deal here with the unusual situation in which an antitrust violator actually may be threatened with multiple liability in a succession of suits (e.g., by an immediate purchaser, by the purchaser's customers, etc.). See note 35 supra and accompanying text.